# CHARLESTOWN.

## McClure v. Maitland.

Submitted January 23, 1884—Decided September 20, 1884.

| | |
|---|---|
| 24 | 561 |
| 36 | 499 |
| 24 | 561 |
| 38 | 110 |
| 38 | 345 |
| 38 | 683 |
| 24 | 561 |
| 39 | 188 |
| 24 | 561 |
| 40 | 54 |
| 24 | 561 |
| 41 | 305 |
| 24 | 561 |
| 42 | 568 |
| 24 | 561 |
| 44 | 677 |
| 44 | 693 |
| 45 | 426 |
| 24 | 561 |
| f46 | 136 |
| 24 | 561 |
| 56 | 472 |
| 56 | 476 |
| 24 | 561 |
| f64 | 597 |
| 64 | 665 |
| 64 | 682 |
| 64 | 696 |
| 64 | 700 |
| 64 | 703 |

1. The proceedings provided by chapter 134 of the Acts of 1872–3 for the sale of lands for the benefit of the school fund are not judicial proceedings in the sense that they involve litigation between contesting parties; nor are they proceedings technically either *in rem* against the land, or *in personam* against the former owner of the land; but are in their character administrative, being simply a mode prescribed by the State for the sale of lands, which are her absolute property, and in the sale of which she alone is interested. (p. 573–79.)

2. The effect of section 5 of article XIII of the Constitution of this State, giving to the former owner the surplus proceeds of the land over the taxes, &c., does not confer upon him any interest in the land or right to participate in, or be a party to, the proceedings for the sale of it. The grant to him of such surplus proceeds is wholly gratuitous, and his claim thereto is confined to the proceeds as such and he can obtain them only in the manner prescribed by law. (p. 580.)

3. The former owner, having no interest in the land or the proceedings for its sale, is not entitled to be a party to the proceedings for the sale in the circuit court, and he, consequently, cannot appeal to this Court. (p. 581 )

The facts of the case appear in the opinion of the Court.

*J. W. Davis, S. S. Green* and *D. B. Lucas* for appellant.

*J. W. McCreery, J. M. French, Watts & Kennedy* and *W. A. Quarrier* for appellee.

SNYDER, JUDGE:

The commissioner of school lands of Wyoming county having filed his report in the circuit court of said county showing that a tract of two hundred and seventy-three thousand acres of land assessed in that county for taxes in the names of Maitland and Jackson had been returned delinquent for the non-payment of the taxes thereon for the years 1873 and 1874; that in 1875 the Auditor had certified said land to the sheriff for sale for said taxes; that the same had

been sold by the sheriff and purchased by him on behalf of the State for ten thousand four hundred and forty-seven dollars and twenty-three cents the amount of the taxes, &c., due thereon as of November 23, 1875; that the owners having failed to redeem said land within one year after the date of the sale, the same became irredeemable and the title thereto vested in the State; and that thereafter the Auditor certified the same to the said commissioner of school lands to be proceeded against and sold as school lands. Subsequently, on October 16, 1879, W. B. McClure, commissioner of school lands for said county, filed his petition in said court, stating therein in detail the delinquency, return, sale by the sheriff and forfeiture to the State of the title to said land, that the same was liable to be sold for the benefit of the school fund, and making Joseph Maitland and others parties thereto. The court directed process to issue against the persons named in the petition which was duly issued and executed as to the said Maitland by order of publication, he being a non-resident of the State. Several orders of sale were made by the court, the land surveyed and laid off in parcels not exceeding six hundred and forty acres each, sales of many of said parcels were made which were reported to and confirmed by the court, the whole number of acres sold aggregating about seventy thousand acres. Among others, orders directing and confirming sales were entered by the court on May 7, 1880, October 8, 1880, July 21, 1881, November 24, 1881, and April 11, 1882. Before the entering of said order of July 21, 1881, Maitland appeared and excepted to the report of sales made to that term; and subsequently at the November term, 1881, he filed his petition stating that he was a non-resident of the State, that he had not been personally served with process, and therefore asked that the decrees and proceedings theretofore entered in the cause might be re-heard. He also filed his petition and bond at the same term to have the cause and proceedings removed to the United States Circuit Court under the act of Congress, passed March 3, 1875. He also filed his answer and excepted to all the reports of sales made after his appearance and resisted the orders of confirmation; but at no time and in no manner did he or any other party allege or claim that

the taxes causing the forfeiture alleged in the report of the commissioner had been paid or by petition or otherwise assert any claim to the surplus proceeds of the sales.   The court overruled his motion to remove the proceedings to the Federal court as well as all exceptions taken by him to the reports of the commissioner and all of said sales having been confirmed, Maitland appealed to this Court, alleging as grounds of error therefor various insufficiencies, defects and irregularities in the orders and proceedings, under and by which the sales were made and confirmed.

On behalf of the appellees, W. B. McClure, commissioner of school lands, and Robert S. Delaplain and others, purchasers of the lands sold, it is claimed that under the Constitution and laws of this State, Maitland, as the former owner of the land—and he claims in no other right or·capacity— has no such interest in the subject-matter of the proceeding as entitles him to appeal; that he is not legally a party and has, therefore, no *locus standi* in court; that the land having been forfeited and become irredeemable the title thereto was vested absolutely ·in the State; that this proceeding by the commissioner of school lands for the sale of forfeited lands is simply a means provided by law for the conversion of the lands of the State into money for the benefit of the school fund; that it is a proceeding neither *in personam* against the former owner, nor *in rem* against the land, but merely a sale of the property of the State by the State acting through her courts and officers; and that it is neither a suit nor a controversy, but is simply and solely a means provided by the State to dispose of lands of which she is the absolute and exclusive owner.

In determining whether or not the position thus asserted by the counsel for the appellees is sound and well taken, I deem it important to understand the legislation and policy adopted by the State of Virginia in regard to delinquent and forfeited lands prior to the formation of this State.   I shall, therefore, briefly state such parts of that legislation as relate to the subject under consideration.

Shortly after the declaration of independence the General Assembly of Virginia by statute, passed in May, 1779, established a land office for the State and made provision for sell-

ing and granting the extensive domain of unappropriated lands belonging to the commonwealth and for ascertaining and fixing the rights of occupants and holders of lands theretofore settled and appropriated. Under this statute and the subsequent amendments thereto, nearly all the lands lying west of the Alleghany mountains in what is now the territory of West Virginia were granted. According to its provisions any person, upon the payment into the treasury of two cents per acre, could obtain from the register of the land office warrants for as much land as he might desire to enter. These warrants authorized the holders to locate the quantity therein specified upon any waste and unappropriated lands they might select; and they were required to enter and have their lands so located surveyed within a fixed time and return their surveys to the register. The Governor then issued a grant to the owner of the survey for the land therein described, and the title of the commonwealth was thereby transferred to and vested in her grantee.

The result of this loose, cheap and unguarded system of disposing of her public lands was, that in less than twenty years nearly all of them were granted—the greater part to mere adventurers, in large tracts, containing not only thousands but frequently hundreds of thousands of acres in one tract. The grantees were often non-residents and few of them ever saw their lands or expected to improve or use them for purposes other than speculation. The entries and surveys were often made without reference to prior grants, thus creating interlocks and covering land previously granted, so that in many instances the same land was granted to two or more different persons. Sometimes upon one survey actually located others were constructed on paper by the surveyors without even going upon or seeing the lands, thus making blocks of surveys containing thousands of acres none of which were ever surveyed or identified by any marks or natural monuments.

Under the workings and operations of this system it did not require much time for the commonwealth to discover that, while she was rapidly disposing of her lands at two cents per acre, she was not attaining the main purpose in view, the settlement of her territory and a revenue from the

owners of her lands.   She found not only that her grantees failed to settle and improve their lands, but that in most cases they wholly neglected to pay the taxes thereon, whereby she was deprived of her just revenues, and the settlement of her territory was delayed and embarrassed.   The lands being unoccupied and the residences of the owners in many cases unknown, the only resort for the taxes was the lands themselves.   Therefore, with the hope of making this resort available, the General Assembly by a series of statutes commencing with the act of November, 1781, and ending with the act of February 27, 1828, endeavored to make her taxes out of the lands.   It was first provided that the lands should be levied on and sold for the taxes; but it being impossible to find bidders for many tracts, it was then provided that if the lands failed to sell for enough to pay the taxes they should be purchased on behalf of the public, giving the owners a certain time thereafter to redeem their lands by paying the taxes and if they failed to do so the Governor to appoint persons to sell the lands and pay over the excess beyond the taxes to the former owner—Act of January 17, 1788.   Then all laws authorizing the sale of lands for taxes were repealed, and it was provided that where the taxes on any tract of land were not paid for the space of three years such tract became forfeited and the title vested in the commonwealth and was made subject to re-grant in the same manner as waste and unappropriated lands—Act of December 27, 1790.   Again, lands were directed to be sold for delinquent taxes and if no person bid the price of the taxes and damages due on any tract the title thereto vested in the president and directors of the literary fund in the same manner as if they had been the purchasers thereof and a deed had been executed to them therefor, but the owner was given one year after the sale to redeem—Act of February 9, 1814.   Finally all laws declaring lands forfeited were repealed; and all delinquent and forfeited lands the title to which had vested in the president and directors of the literary fund were made redeemable, and the right to redeem extended from time to time until July 1, 1829.

The preceding statement of the legislation up to this time, has been made not so much because it has any direct bearing upon the questions now under consideration, but more

especially to show the complications and embarrassments in which it involved the commonwealth in relation to her land titles and revenues, and also as showing the necessity and justification for the more stringent measures subsequently taken to remove these embarrassments.  For the result thus far was very unsatisfactory.  The remedies resorted to produced neither taxes nor the settlement of the country.  No one would buy the lands for the taxes and when the commonwealth purchased them the former owners, though given every facility to do so, failed to redeem them.  Thus the sales made amounted to nothing more than the commonwealth selling lands which belonged to her and buying them from herself for the benefit of her literary fund, she being in fact both the seller and the buyer and paying her own expenses.  But the effect of this legislation was not only negative but positively deleterious in its character.  After declaring the lands forfeited, it authorized the re-granting of them and then after grants had been issued it repealed the laws creating the forfeitures and thus placed another tier of grants upon lands which, in many instances, had been already granted more than once.

In this utter confusion and embarrassment it was found absolutely necessary to resort to earnest and rigid measures to compel the owners of land to pay their taxes or in default thereof to have their titles entirely vacated and the lands vested in or transferred to actual settlers and those who were willing to improve the lands and pay taxes on them.  Consequently, to carry out this policy, certain acts were passed by the General Assembly, notably those of April 1, 1831, and February 27, 1835, by which it was provided that all lands lying west of the Alleghany mountains theretofore returned delinquent for the non-payment of taxes and which should not be redeemed by the owners within a fixed time, and all tracts of land which the owners had failed to enter on the books of the commissioner of the revenue or should thereafter fail to enter by a given time, and pay the taxes thereon, should become absolutely forfeited to the commonwealth or the president and directors of the literary fund, and should "be thenceforth forever irredeemable unless such owner by himself or tenant was in the actual possession of said land;"

and the title so forfeited was thereupon transferred to and absolutely vested in such persons, other than those who allowed the forfeiture, as were in the actual possession of any such lands for so much as such persons had just claim thereto, derived from the commonwealth, and had paid all taxes chargeable to them thereon from the time they acquired their titles. The time within which the former owners were allowed to redeem their lands thus forfeited for the non-payment of taxes, or to enter their lands on the books of the commissioner of the revenue in cases of omitted . lands, was by subsequent statutes extended from time to time until July 1, 1838, after which they were - absolutely irredeemable and could not be entered on the tax-books.

In order to dispose of the vast quantities of lands thus forfeited to and vested in the commonwealth and become irredeemable and not exonerated or transferred to junior grantees, the General Assembly in the year 1837 commenced another series of statutes providing for the sale of them by commissioners under the orders and supervision of the circuit superior courts of law and chancery. As it is apparent that this series is the exemplar and foundation of the laws under which the lands in this proceeding were sold, I think it proper to state their provisions in some detail.

The act of March 30, 1837—Harlow on Delinquent and Forfeited Lands, p. 48—is the first of this series, and it provides that all lands then forfeited to and vested in the president and directors of the literary fund by virtue of the several acts of the General Assembly, concerning delinquent and escheated lands, not redeemed before July 1, 1838, shall be sold for the benefit of the literary fund in the following prescribed manner: "That it shall be the duty of the circuit superior court for each county, situate west of the Blue Ridge mountains, at the next fall term thereof, to appoint a commissioner or commissioners, to be styled the commissioner of delinquent and forfeited lands, whose duty it shall be to ascertain and report to the next term of said courts the quantity of delinquent and forfeited lands in his county, designating particularly the number of tracts, and the quantity contained in each tract, and also the local situation and probable value of each tract, together with all the information which

he may be able to procure in relation to the state of the title to said lands.

"That upon the return of said commissioner, it shall be the duty of said courts, by orders entered of record, to direct the said commissioner to make sale of said lands in the same manner, in all respects, as in the case of other lands directed to be sold under decrees of said courts." It then prescribes the place, terms and manner of sale, the mode of collecting the purchase-money and paying the expenses, how the deed shall be made to the purchaser, and the disposition of the proceeds of sale.

The act of March 15, 1838—Har. on D. & F. Lands, p. 53—provides, that the judges of said courts may, in vacation, or in term time, order sales, re-commit or set aside reports and direct others to be made; and also that the Auditor shall make out and transmit to the commissioner of each county a list of all lands forfeited for the non-payment of taxes in his county which have not been redeemed, with such information as to the quantity, location, amount of taxes and damages thereon, and all such other useful information as the records of his office may furnish. And also that the original owner of lands so sold shall be paid by the Auditor the surplus proceeds of the sale after deducting all taxes, damages and costs; but the commissioner shall not sell any lands which were in the actual possession of any one on or before April 1, 1831, holding under grant and who has paid all taxes charged to him thereon.

By the act of March 18, 1841, the commissioner is required to specify and plat out any parcels of land the title to which had been transferred to actual occupants and the courts are directed to exclude such parcels from orders of sale.

The act of March 22, 1842, provides that the original owner may be paid the surplus proceeds of the sale over the taxes, damages and costs upon filing his petition therefor in the court within two years from the date of the sale—Har. on D. & F. Lands, p. 63.

The act of February 13, 1844, allowed the original owner ten years from the date of the sale to file his petition for the surplus proceeds of the sale. It also provides that any person interested in any tract of land sold or decreed to be sold by

such commissioner may within three years file his petition in court contesting the legality or justice of the sale or showing that said land was not subject to sale under the law, and thereupon the same proceedings shall be had as upon a bill in chancery.  The attorney for the commonwealth shall appear on behalf of the literary fund, the purchaser shall be made a party and any party to such petition, who shall feel aggrieved, is given the right to appeal to the court of appeals —Har. on D. & F. Lands, p. 68.

The act of March 5, 1846, which is last of this series, declares that no sales of delinquent and forfeited lands shall be ordered by the courts after the fall term of that year.

Such was in brief the character of the laws of Virginia prior to the formation of this State in regard to delinquent and forfeited lands.

Article IX of the Constitution of 1863 of this State contains in substance the following provisions :  The Legislature shall provide for the sale of all lands in this State heretofore vested in the State of Virginia by forfeiture or by purchase at sheriffs' sales for delinquent taxes and not released, exonerated or redeemed as therein provided, by proceedings in the circuit courts of the county where such lands are situated; and the former owner of land so sold shall be entitled to the excess of the proceeds of sale over the taxes, &c., if his claim be filed in court within two years after the sale.

. It is not deemed necessary to give here the statutes enacted to carry the provisions of this Constitution into effect, as they are virtually the same as those passed to give effect to the Constitution of 1872 to be hereafter stated.  They may be found, however, in chapters 31 and 105 of the Code of 1868.

The provisions of the Constitution of 1872, relating to land titles, are contained in article XIII, and so far as they bear upon the matter in this case they are as follows:   By section 3 it is declared that the title to lands in this State heretofore or hereafter forfeited or treated as forfeited or purchased at sales made for the non-payment of taxes and become irredeemable, not redeemed, released or otherwise disposed of is hereby transferred to and vested in junior claimants as to so much thereof as they have title or claim of

the character therein defined.    The fourth and fifth sections are in these words :

"4. All lands in this State, waste and unappropriated, or heretofore or hereafter for any cause forfeited, or treated as forfeited or escheated to the State of Virginia, or this State, or purchased by either and become irredeemable, not redeemed, released, transferred or otherwise disposed of, the title whereto shall remain in this State till such sale as is hereinafter mentioned be made, shall by proceedings in the circuit court of the county in which the lands, or a part thereof, are situated, be sold to the highest bidder.

"5. The former owner of any such land shall be entitled to receive the excess of the sum for which the land may be sold, over the taxes charged and chargeable thereon, or which, if the land had not been forfeited, would have been charged or chargeable thereon, since the formation of this State, with interest at the rate of twelve *per centum per annum*, and the costs of the proceedings, if his claim be filed in the circuit court that decrees the sale within two years thereafter."

The statutes intended to carry out these provisions may be found in chapters 117 and 134 of the Acts of 1872–3.

Chapter 117 provides that the sheriff of each county shall every year return to the Auditor as delinquent all lands on which the taxes have not been paid, that the Auditor shall every two years certify back to the sheriff all such lands to be sold by him at public auction, and if no person bids the amount of the taxes, &c., due thereon, the lands shall be purchased by the sheriff for the State.    The owner may pay the taxes on such lands at any time before the sale, and if he does no sale can be made thereof, or he may redeem them by paying the taxes and damages within one year after the sale, but if he fails so to do, the lands become irredeemable and the title thereto vests absolutely in the State.

Chapter 134 provides for the appointment, by the circuit courts of each county, of "a commissioner to be styled the commissioner of school lands, whose duty it shall be to ascertain and report to said courts the quantity of land in his county subject to sale, according to the preceding section," (the same in substance as section 4 of the Constitution of 1872, hereinbefore quoted,) "designating particularly the

number of tracts, their local situation, and the quantity and probable value of each, together with all the information which he may be enabled to procure in relation to the title to such lands; and where necessary he may employ a surveyor to survey the same."

Section 3 refers exclusively to waste and unappropriated lands and has no bearing on the class of delinquent and forfeited lands involved in the present case.

Section 4. "Upon the return of said commissioner it shall be the duty of the courts, by order entered of record, to direct the said commissioner to make sale of said lands in the same manner in all respects as in the case of other lands directed to be sold under decrees of said court." It then prescribes the place, terms and manner of sale, the mode of collecting the purchase-money and paying the expenses, how the deed shall be made to the purchaser and what disposition shall be made of the proceeds of the sale.

It is made the duty of the prosecuting attorney to represent the interests of the State in all matters relating to such sales and proceedings.

It excepts from sale all lands which by operation of section 3 of article XIII of the Constitution are transferred to and vested in junior grantees or claimants; and it provides for the recovery of the excess of the proceeds of sale by the former owner within two years in the manner following:

"13. Any such former owner may, within the time aforesaid, file his petition in the said circuit court, stating his title to such lands, accompanied with the evidence of his title; and upon full and satisfactory proof that at the time the title to said lands vested in the State, he had a good and valid title thereto, legal or equitable, superior to any other claimant thereof, such court shall order the excess mentioned in the next preceding section to be paid to him; and upon a properly certified copy of such order being presented to the Auditor, he shall draw his warrant on the treasury in favor of such owner, or his personal representative for such excess."

The fifth and eighth sections of said chapter 134 are amended and re-enacted by chapter 63 of the Acts of 1879, but the changes made therein are not material in this case.

Such is a general statement of the constitutional and statutory provisions of this State relating to delinquent and forfeited lands in force at the time this proceeding was instituted in the circuit court of Wyoming county.

An inspection of these provisions as they appear at large will establish manifestly that they were framed for the purpose and with the evident intention of putting in force and rigidly carrying out the system and policy inaugurated by the Acts of the General Assembly of Virginia of March 30, 1837, and March 15, 1838, hereinbefore mentioned, and that in every essential particular they are almost literal copies from said acts.  The nature of the State's title to the lands, the terms employed to describe it, the duties prescribed for the court and the commissioner, the manner of conducting the sale and the terms thereof, the disposition of the proceeds, the right of the former owner to the excess of the proceeds and the mode of his obtaining the same, are defined and declared in the two classes of laws in equivalent terms and in most instances in identical language.  It is true that the present provisions embrace several classes of lands that were not covered by said acts and they exclude some that were included in the latter.  It is also true that the sixth section of the Act of March 15, 1838, directs that the court may "recommit or set aside" the reports of the commissioner, while the fifth section of chapter 105 of the Acts of 1872–3 directs that "the court shall confirm the report unless it be excepted to, and competent evidence be offered to show that it should be set aside."  Also in the one case the quantity that may be sold in one parcel is limited to not exceeding six hundred and forty acres while in the other the quantity to be sold in one tract is not limited.  But all these and whatever other differences may appear in them are immaterial and the closest examination will, it is believed, fail to discover any differences that can destroy or affect the analogy in the provisions of the two classes of law so far as they bear upon the class of lands to which those belong in this proceeding.  It has been suggested that the right to except to the commissioner's report implies that it was contemplated there should be parties and controversy.  I do not think such was intended.  The prosecuting attorney is required to repre-

sent the State, and as he is the only actor other than the commissioner and the court mentioned as having any part in the proceedings, the legitimate inference, it seems to me, is that the right to except refers to him and authorizes him to except when the interests of the State require it.

The analogy being thus apparent we must presume, according to a well settled principle of law, that the framers of our present Constitution and statutes by adopting the provisions of the Acts of 1837 and 1838 intended thereby to adopt also the construction theretofore uniformly placed upon them by the courts of Virginia. We having, therefore, by this rule, adopted the Virginia construction of said acts it is material to enquire what that construction was, as it forms a part of the law of this State.

The first reported case that I have found on the subject, is that of *Hope* v. *Currin*, 3 Gratt. 201, decided in 1846. From the report of this case it appears that the mode of proceeding was as follows: The commissioner of delinquent and forfeited lands simply reported to the court that he had found certain described tracts of land returned delinquent and forfeited in the names of persons mentioned. The court then made an order of sale of the lands thus reported, the sale was made by the commissioner and reported by him to the court by which the sale was confirmed, and an order made directing the commissioner to convey the State's interest in the land to the purchaser by deed upon the payment of the whole purchase-money. This was the whole form and substance of the proceeding. No petition was filed, neither the former owner nor any other party was summoned or in any manner brought before the court. No pleadings were had and nothing to indicate or even suggest any controversy with any one or the recognition of any interest in the lands or the proceedings by any one other than the State, It was throughout and in all respects treated merely as an *ex parte* proceeding by the commissioner and the court for the sale of the lands as the absolute property of the commonwealth.

The mode of proceeding given in all the subsequently reported cases is of precisely the same character, as will fully appear from the reports of the following cases: *Stants* v. *Board*, 10 Gratt. 400; *Wild* v. *Serpell*, *Id.* 405; *Smith* v. *Chap-*

man, *Id.* 445; *Lavasser* v. *Washburn*, 11 *Id.* 572; *Atkins* v. *Lewis*, 14 *Id.* 30; *Hitchcox* v. *Rawson*, *Id.* 526; *Miller* v. *Williams*, 15 *Id.* 213; *Twiggs* v. *Chevallie*, 4 W. Va. 463; and *Strader* v. *Goff*, 6 *Id.* 257.

These were all collateral actions—none of them were appeals directly from orders or decrees directing or confirming sales, as none such appear in the reports—but in each of them the validity and regularity of the proceedings for the sale of delinquent and forfeited lands were assailed and in every instance where the land had been in fact forfeited and the mode pointed out by the acts substantially complied with the proceedings were approved and sustained by the appellate court.

When it is remembered, for such is the fact, that nearly or quite one half of all the lands in Randolph, Upshur, Lewis, Doddridge, Ritchie, Wood and in all the counties of this State lying south of and between those counties and the Virginia and Kentucky State-lines were sold and many of the titles in that section are held under titles derived from sales under these proceedings, and that no case can be found in which an appeal was ever asked for, much less allowed, the conclusion is irresistible that no one ever even supposed that an appeal could or that it was intended one should be taken from such proceedings.

As additional evidence of the correctness of this conclusion, by the subsequent act of February 13, 1844, provision was made for "contesting the legality or justice of the sale, or order directing such sale, or that the said land was not subject to sale under the law," by "any person interested in any tract of land which may have been sold or ordered to be sold, or may hereafter be sold" under said acts of 1837 and 1838, by such person filing his petition in court within three years after the date of such sale, and "thereupon the same proceedings shall be had as upon a bill in chancery." And any party to such petition shall have the right of appeal to the court of appeals from any order or decree made on the hearing of such petition as in other cases affecting the title to lands—Har. on D. & F. Lands, p. 68. It is very evident, if the right of appeal had been believed to exist, that this act would not have been passed and the fact that it was passed is,

therefore, very forcible evidence that it was understood that before its enactment no right of appeal existed. The proceedings for the sale of forfeited lands as well as the right of appeal, being entirely statutory, they must be confined to the provisions of the statute, and where any right or authority is claimed in either case, it must be found in the statute, otherwise it will be regarded as not existing. In the constitutional and statutory provisions of this State the said act of February 13, 1844, has been altogether omitted and no provision has been made in either for any party to appear in, contest, or appeal from, the proceedings in such cases.

But it is most earnestly argued by the counsel for Maitland that he, as the former owner of the land, being entitled, under section 5 of article XIII of the Constitution, to the excess of the proceeds of sale over the taxes, &c., was a necessary party, upon the well established rule of equity which requires that all parties in interest must be brought before the court before a decree of sale shall be entered, and having this right and having also appeared in the court below he may appeal from an adverse decision. This is claimed, as I understand it, as a constitutional right and independent of any statutory provision. If it has an existence such must be the case as there is, as we have seen, no such right given by the statute. But I do not think this position can be maintained upon any legal ground, because it erroneously assumes that the proceeding is a judicial one and that Maitland as the former owner has an interest in or lien on the land or some interest in these proceedings.

In the year 1831, as we have endeavored to show in a former part of this opinion, the land titles in that portion of the commonwealth of Virginia now embraced within this State were in a most wretched and embarrassed condition. Many owners of large tracts, covering in some cases almost entire counties, would neither pay their taxes nor settle and improve their lands, thus paralyzing the energy and contravening the prosperity of the people and the advancement and population of the State to an almost inconceivable extent. In this emergency and to remedy this calamitous evil the General Assembly of Virginia inaugurated the system of delinquent and forfeiture laws that form the basis of the pro-

visions of our present Constitution on that subject. The whole history of that system shows a most earnest and determined effort on the part of the Legislature, the judiciary and the people, speaking through our present Constitution, to destroy and annihilate the titles of such delinquent owners, who should, after every reasonable opportunity had been given them to comply with the laws, continue in default, and to protect actual settlers and those not in default. The purpose of the statutes passed to enforce this system was not merely to create a lien for the taxes on these delinquent and unoccupied lands, but to effect by their own force and vigor an absolute forfeiture of them and effectually vest the title thereto in the State without the machinery of any proceeding of record or anything in the nature of an inquest of office. Such was intended to be and such was in fact the effect of these statutes. The constitutional competency of the Legislature to pass these laws and thus consummate the forfeiture and perfectly divest all the right, title and interest of the former owner by the mere energy and operation of the statutes themselves, has been repeatedly affirmed by the court of appeals of Virginia—*Staats* v. *Board*, 10 Gratt. 400; *Wild* v. *Serpell*, Id. 405; *Levasser* v. *Washburn*, 11 Id. 572; *Usher* v. *Pride*, 15 Id. 190; see also *Smith* v. *Tharp*, 17 W. Va. 221.

In *Wild* v. *Serpell*, *supra*, Judge Lee, in delivering the opinion of the court, says: "Considering the peculiar condition of things in that portion of the State lying west of the Allegheny mountains, and the serious check to population and the improvement of the country and the development of its resources growing out of it, a resort to the stringent measures of legislation that were adopted was, in my opinion, as wise and expedient as the constitutional power of the Legislature to enact them was clear and unquestionable"—10 Gratt. 409.

The title to the land and all the right and interest of the former owner having thus by his default and the operation of the law become absolutely vested in the State and become irredeemable, she, having thus acquired a perfect title to, and unqualified dominion over, the land, had the undoubted right to hold or dispose of it for any proper purpose, in any

manner and upon any terms and conditions she might in her sovereign capacity deem proper without consulting the former owner or anyone else.   For after the forfeiture had become complete, as it had in the case before us, the former owner had no more claim to or lien upon the land than one who never had pretended to own it.   In the exercise of this perfect dominion over her own property the State saw proper to transfer and vest her title to so much of said land owned by her, in any person, other than those who occasioned the default, as such person may have. been in the actual possession of, or have just title to, claiming the same and was not in default for the taxes thereon chargeable to him.   And as to .the lands the title to which was not so transferred or otherwise released or exonerated, she- elected to sell them at public auction and for that purpose appointed as her agents commissioners who were required by law to act under the direction and orders of her courts of record   The proceedings provided for effecting these sales have always been treated, as they were and are in fact, both under the acts of 1837 and 1838 of Virginia and the Constitution and statutes governing this case, merely as *ex parte*.   They are certainly proceedings neither *in rem* nor *in personam*; neither against the land itself nor against the former owner or any other person.   The laws, as we have shown, by their own force, transferred to and vested the title to the land absolutely in the State without any judicial enquiry or inquest of any kind.   There could, therefore, be no necessity or reason for proceeding *in rem* against the land.   That had already become the absolute property of the State and she had a perfect right to sell it without further enquiry.   All the laws providing for the sale of these lands pre-suppose the title to have vested in the State prior to the commencement of the proceedings.   In fact the whole authority of the commissioner. and the jurisdiction of the court are based upon the assumption that the unconditional title is in the State; for unless such is the fact neither has any authority to act—*Twiggs* v. *Chevallie*, 4 W. Va. 463.

And all the right, title and interest of the former owner having been completely divested, he has not a particle of interest in the land—no more than if he had never owned it—

73

there is, therefore, no possible reason for making him a party or proceeding against him *in personam* or otherwise. The proceeding is of necessity then neither *in rem* nor *in personam*; and as all judicial proceedings properly so styled must belong to either the one or the other of these classes, it follows that this is not and can not be in any technical sense a judicial proceeding.

I am aware that the statute declares that "it shall be the duty of the court, by order entered of record, to direct the commissioner to make sale of said lands in the same manner in all respects as in the case of other lands directed to be sold under decrees of said court." This, however, does not say that the sale shall be by a judicial proceeding or that the court in ordering it shall act in a judicial capacity in any other respect than in any *ex parte* proceeding that might be brought before it. The direction is merely as to the duties of the commissioner and not as to the court. I am also aware that in some of the opinions of the court of appeals of Virginia these proceedings are referred to as being in their nature judicial. Judge Lee, in delivering the opinion of the court in *Smith* v. *Chapman*, says: "The proceeding was one in the nature of a judicial proceeding, and the orders and decree of the court made on it were conclusive at least upon strangers. As against them those claiming under it could not be called on to show its regularity"—10 Gratt. 465.

It seems to me that a judicial proceeding which is more conclusive on strangers than parties is a very anomalous one in its character. A judicial proceeding in the ordinary and technical sense is generally conclusive on parties but not on strangers. But it is manifest from the context in this case, as in others where similar language is employed, that the phrase, judicial proceeding, is not used in the sense of a suit or controversy between parties. In a subsequent opinion of the court delivered by the same judge he speaks of them as *ex parte* proceedings—14 Gratt. 530. And in *Twiggs* v. *Chevallie*, 463, this Court decided that if the commissioner under decrees of court in such proceedings sells land as delinquent and forfeited land when it is in fact not forfeited, the court in such case is without jurisdiction, the proceeding is *coram non judice* and the sale is void. Also, in *Strader* v.

*Goff*, 6 W. Va. 257, the Court decided that in a collateral suit such proceedings were only *prima facie* evidence of forfeiture and if no forfeiture had taken place they were without any efficacy whatever.   These authorities indicate that the acts of the court in ordering and confirming sales are merely *ex parte* and not judicial proceedings in the sense that they involve litigation or the determination of a controversy between adverse parties.   They are in my opinion more in the nature of administrative and *ex parte* proceedings—such as orders and entries made by courts in transacting the police and fiscal matters of a county—than they are in the nature of judicial controversies.   They are merely a mode provided by the State for effecting the sale of lands which are her absolute property.   She being a corporate body can act only by agents duly appointed by her.   The commissioner and the court are her agents appointed for that purpose.   The constitutional and statutory provisions, authorizing and declaring the manner of making these sales, are in effect a power of attorney or commission appointing and conferring upon the court and commissioner the authority to sell them, and the reports of the commissioner and the orders of the court, with the deed of the commissioner to the purchaser, are merely the evidence of the sale and transfer of the title from the State to the purchaser.   The State could have established any other agency for the disposal of her lands having no connection with her courts, and sales thus made would be just as effectual to pass her title as those made under this form of proceeding.   The Federal government and the commonwealth of Virginia sell their lands through the agency of their respective land offices without any pretense of a judicial proceeding, and no one questions their power to do so.

The land sold being the property of the State and the court and commissioner her agents to make the sale, they are responsible to her and to her only for their acts.   But like all other agents they must act within their authority and in the manner prescribed by it or their acts will have no effect. Therefore, unless they in making sales of the forfeited lands of the State, do substantially conform to the provisions of the statutes conferring the authority, their acts and pro-

ceedings will be ineffectual to divest the State's title or transfer it to the purchaser—*Miller* v. *Williams*, 15 Gratt. 213. But the former owner having by the forfeiture been completely divested of all title and interest in the land, he in fact is a stranger to the proceedings, and cannot be heard to complain or question them however irregular, defective or informal they may be. This conclusion imposes no hardship on the former owner, because if the land was really forfeited he has, as we have seen, no interest whatever in it, and if it had not been in fact forfeited, the proceedings would be *coram non judice* and he could recover it from the purchaser in a collateral action—*Twiggs* v. *Chevallie*, 4 W. Va. 463; *Strader* v. *Goff*, 6 *Id.* 257. This being then not a judicial proceeding and the former owner having no interest in the subject, he was not upon any rule of law or equity practice entitled to be made a party, or to be heard in the proceeding.

But it is insisted that the section of the Constitution referred to grants to the former owner such an interest in the land as entitles him to be heard. This position, I think, is likewise untenable. The preceding, or fourth section of the Constitution, shows that the former owner, by reason of the forfeiture, was divested of every particle of interest in the land and its proceeds, and that he had no more title or right to either than if he had never had any interest in the land. It necessarily follows then that the grant or claim thus conferred upon him, is a simple matter of grace, a gift without any consideration therefor, owing its whole existence to the volition of the grantor, and it is in no sense the recognition of a pre-existing right to, or claim upon the land or its proceeds. It is a mere bounty gratuitously bestowed by the State, which she had the undoubted right to give or withhold. And having this perfect right to give or not to give, the State unquestionably had the right, if she chose to make the gift, to fix not only its *quantum*, but also the form in which it should be received and the manner of its payment. This she has done in explicit terms by fixing the surplus as the *quantum*, the proceeds as the form and the filing of his claim therefor within two years *after* the sale of the land as the manner. It is apparent that the terms, "excess of the sum for which the

land may be sold over the taxes," &c., are employed not to give the former owner an interest in the surplus proceeds as such, but merely as a measure of the *quantum* to which he shall be entitled upon filing his claim within the time prescribed. The whole history as well as the express language of this constitutional provision proves that it was the intention to bestow upon the former owner whatever part of the proceeds of sale might be actually paid or liable to be paid into the State treasury, after the State had sold the land and paid all the taxes, costs, &c., out of the proceeds of the sale; and that it was clearly not intended to give him any interest in the land or its proceeds until a surplus should be ascertained by the proceedings conducted alone by the State through her officers. "Beggars must not be choosers" is a just maxim, and, therefore, it is the duty of the courts to see that the bounty of the State is not used to her detriment by giving to this provision of her Constitution a forced construction and one that could never have been intended. I am, therefore, of opinion that said fifth section of the Constitution did not confer upon the appellant, Maitland, any claim or interest in the land, or any interest or right to participate in the proceedings for its sale, his right to the surplus proceeds not arising until after the sale.

In the argument for the appellant it was assumed that sales made by commissioners of school lands were in some respects similar to sales of lands by sheriffs for delinquent taxes, and that, therefore, the proceedings must be construed with the same strictness and scrutiny. This is clearly a mistaken view. In the case of such sales by the sheriffs, the lands sold are the property of the owner, the State having no claim thereto beyond her taxes. The sale is the enforcement of the State's lien for her taxes and nothing more. But in the case of sales by the commissioner of school lands, the lands sold are the absolute property of the State, the former owner having no interest therein whatever. If the sale is irregular or improper in the former case the owner is prejudiced and he has the undoubted right to test the legality of the sale; but in the latter case the former has no interest and cannot, therefore, be prejudiced by the sale, however irregular or improper the proceedings under which it was made.

It is finally urged by the appellant through his counsel that he has been harshly treated, that his "lands have been completely sacrificed, and that for no public good, but only to enrich those who desire riches without labor." I can make no more appropriate reply to this complaint than that contained in the closing paragraph of the brief filed by the counsel for the appellee, R. S. Delaplain, which is as follows:

"Here is a man who owned two hundred and seventy-three thousand acres of land, a territory larger than a German Principality or a Swiss Canton, or than the Republic of San Marino, who by his answer confesses that he has paid no taxes upon this immense tract since 1872, a period of twelve years; that for twelve long years he has avoided and shirked the duties imposed upon him by law; has refused to make his lawful contribution for the suppression of crime, and the maintenance of good government, for the construction of roads or the diminuation of illiteracy and ignorance. A man, who together with his predecessors in title, have maintained this territory in such a condition, that after the lapse of almost a century since the issuing of the original grant, the sheriff of Wyoming county has twice returned under oath, that there is not on the land sufficient personal property to make by distress, one year's taxes. And who does not now show any signs of regret and remorse for his bad conduct; who does not at the end of these twelve years offer to make tardy and partial reparation by the payment of the taxes so long over due; who is here asking not to pay his taxes, but that sales already made and confirmed shall be set aside and another opportunity given him to bid, who has twice before refused to bid, at the sale of the same land."

Then after the most careful and laborious examination and consideration of the important questions involved, with an anxious appreciation not only of the great public interests concerned, but of the serious and, perhaps, disastrous consequences to the appellant, we can come to no other conclusion than that this is a proceeding by the State alone for her own purposes and in her own behalf, and that, therefore, the appellant, Maitland, had no interest in it or right to be a party thereto in the circuit court or to appeal to this Court. It follows, consequently, that this Court having no jurisdic-

tion to consider, and the appellant no right to complain of any errors, if such there be, committed by the circuit court, this appeal must be dismissed as having been improvidently awarded.

DISMISSED.