LASHER et al. v. McCREERY et al.

(Circuit Court, D. West Virginia. February 25, 1895.)

1. TAXATION—FORFEITURE OF LANDS—FAILURE TO ENTER ON COMMISSIONER'S BOOKS.

The omission of a tract of land from the books of the commissioner of the revenue for only two years (1843 and 1844), and the failure afterwards to charge up the back taxes for said years, did not work a forfeiture of said land to the state under the act of the legislature of West Virginia of 1869 (chapter 125).

2. SAME.

There can be no forfeiture, under said act of 1869, for nonentry on the commissioner's books, unless the land was left off said books each year for five successive years, and the omission of the land from said books for any less number of years than five did not work a forfeiture under said act.

3. SAME—PROCEEDINGS AGAINST REMOTE GRANTOR.

Robert Morris owned a tract of land containing 480,000 acres, in Virginia, and in 1797 he conveyed it away. In 1843 it was sold by the commissioners of delinquent and forfeited lands in the name of Henry Cramond, a remote grantee of the said Morris. In 1853, Michael Bouvier, to whom it had passed by mesne conveyances from the purchaser at said sale, divided it into six separate parcels, all of which he afterwards conveyed to others, except one parcel of 8,400 acres. So far as appears, the several parcels were assessed to their respective owners, one of said parcels, con-

taining 36,750 acres, having been regularly assessed to the grantee of said Bouvier, and those claiming under him, from the time of its conveyance by Bouvier to the present time, but was returned delinquent for the nonpayment of the taxes of 1869, and sold by the sheriff in 1871, and purchased for the state. In 1882 the commissioner of school lands instituted proceedings against the original tract of 480,000 acres as forfeited in the name of Robert Morris for nonentry on the land books, and in said proceedings portions of the 36,750-acre parcel were sold. *Held*, that said proceedings were coram non judice, and a decree declaring a forfeiture in said proceedings, and the said sales of portions of said 36,750-acre parcel by said commissioner in said proceedings, were illegal and void.

4. SAME—PRESUMPTIONS FROM LAPSE OF TIME.

Where a tract of land was sold in 1843 by the commissioners of delinquent and forfeited lands, and no claim appears to have been made to said land afterwards by the person in whose name it was forfeited prior to said sale, or any one claiming under him, it will be presumed, in a proceeding involving the title to said land, instituted in 1890, that the proceedings which resulted in the said sale were regular, and that a new title began from the time of said sale by said commissioners.

5. SAME—DELINQUENT TAX SALE—IRREGULARITIES.

Under the Code of 1868 of West Virginia the sheriff was required, within 10 days after a delinquent tax sale, to return to the county clerk's office a list of the real estate purchased for the state at such sale, and, unless it affirmatively appear that such list was so returned within said period of 10 days, the said sale will be *held* to be irregular and void.

6. LACHES—EQUITABLE CONSIDERATIONS

The defense of laches, being equitable in its character, will not be allowed to deprive a rightful owner of his land, unless the principles of equity require it to be done.

7. SAME.

Laches cannot be imputed to one who was ignorant of his rights, and for that reason failed to assert them.

8. SAME—TAX SALE.

Where wild and unimproved lands were sold in 1882, by the commissioner of school lands, in proceedings which were illegal and void, and the purchaser never took possession of said lands, nor made any improvements on them, or change in their condition, and the former owners continued to pay taxes regularly on said lands after such sale, and in 1890 brought a suit to set aside said sale, alleging that they were ignorant of said sale until a short time before said suit was brought; and it appearing that during nearly the whole of the time covered by the delay in bringing said suit on account of certain decisions of the appellate court of the state it was generally believed and understood by the legal profession and others that there was no remedy for the former owner in such case until a decision by the United States court pointed out such remedy, and said suit was brought soon after said last-mentioned decision,—*held*, that there was not such laches on the part of the former owners in bringing said suit as would constitute a defense to said suit.

9. SAME.

The decision in the case of Wakeman v. Thompson, reported in 40 Fed. 375, 32 W. Va. (Appendix, p. 1), adhered to.

This was bill by Francis Lasher and others, trustees, against John W. McCreery and others, to remove a cloud upon the title to real estate by annulling certain deeds made by the commissioner of school lands in Wyoming county, W. Va.

Couch, Flournoy & Price, for plaintiffs.

W. E. Chilton, E. S. Miller, and Johnson, Watts & Ashby, for defendants.

Before GOFF, Circuit Judge, and JACKSON, District Judge.

JACKSON, District Judge. The bill alleges that the tract of land in controversy in this case is a portion of two grants of land issued by the commonwealth of Virginia in 1795 to Robert Morris, one for 320,000 acres and the other for 480,000 acres. The evidence discloses a chain of title from the grantee down to Henry Cramond, who acquired the lands by deed from the heirs of Thomas Astley on the 10th day of December, 1840. It appears that the two tracts of land became forfeited in the name of Henry Cramond to the state of Virginia for the nonpayment of taxes thereon prior to the year 1842, and that the lands so forfeited and embraced in the two grants were sold in 1843, at which sale William Cramond became the purchaser; that subsequently Michael Bouvier, by various mesne conveyances, acquired the title to them, and, having had a resurvey made of them, he divided all of his lands into six tracts, one of which was 36,750 acres,—the subject-matter of this controversy. It is disclosed that the plaintiffs acquired the legal title to 36,750 acres by proper conveyances from the grantee in the patent down 'o the date of his deed in 1882. It also appears that the lands were charged with taxes to John Herman on the assessor's books for Tazewell county, Va., for the year 1847 to the year 1861, inclusive, and were paid; that, owing to the Civil War, there were no taxes charged against these lands until the year 1865, when they were charged to Michael Bouvier, in McDowell county, with taxes for the years 1865–1868, both inclusive. In the year 1869 this tract was consolidated with a tract of 8,400 acres, one of the six divisions before referred to, and entered on the assessor's books of McDowell county as a tract of 45,150 acres, charged with taxes, returned delinquent for their nonpayment that year, and sold by the sheriff of the county in October, 1871, and purchased by the state. After the year 1869 the lands appear on the land books of Wyoming county in the name of Patterson and others, who were the owners of the tract from 1870 to 1874, inclusive, when they appear in the name of Francis Lasher from 1875 to 1890, inclusive,—the year the plaintiffs brought this action. And in this connection it is to be observed these two large tracts of land, lying both in McDowell and Wyoming counties, appear to have been assessed sometimes in one county and then in the other.

It is apparent from this history of the title to the land in controversy that, with one exception, from the time it was purchased by William Cramond, at the sale made by the commissioner of forfeited and delinquent lands in 1843, it has been charged on the land books in the names of its various owners, and the taxes paid. It is, however, of little or no moment at this time to investigate the history of this title prior to the delinquent sale in 1843. We must, at this late day, presume that the proceedings which resulted in the sale of the land were regular, and that a new title began at that time, which has been transmitted by regular conveyances to the plaintiffs in this action. It follows from what we have said that the title to the land in controversy is in the plaintiffs to this action, unless they have lost it, since they acquired it, by neglect, or in some way permitted it to pass from them.

This brings us to the consideration of the questions raised by the defense to defeat this action. And here it is to be observed that the purpose of this bill is to remove a cloud upon the title of the plaintiffs by securing a decree to annul and set aside the deeds made under the proceedings instituted by the commissioner of school lands in Wyoming county in 1881 under the act of 1873, under which the defendants claim. The answer of the defendants to this position of the plaintiffs is that the land was forfeited under the act of 1869 as amended in 1872–73 for nonentry upon the commissioner's books of Tazewell county for the years 1843 and 1844.

The contention of the defendants, first, is that, if the land was omitted from the proper assessor's book for the year 1832, or any year thereafter, and the owner failed to have the back taxes charged for five successive years thereon, and such further omission continued for one year after the passage of the act, the land became forfeited; or, if the land had been omitted for any year prior to the passage of the act, including and after 1832, or shall not have been charged thereon for five successive years after the passage of the act, then, in either case, such failure operated to forfeit the land. I cannot concur in this construction of the act. It is, to my mind, a forced construction to cover the facts of this case. As we have before seen, the land in controversy was omitted from the assessor's book in 1843 and 1844, and the omission was but for two years; but it appears on all the land books in the names of the various owners from 1847 down to the institution of this suit, with that single exception. What, then, was the duty of the owner of the land under the act of 1869, when it was omitted from the assessor's books? Simply to cause them to be entered on the proper assessor's book, and charge them with the state taxes thereon not charged to the owner for the year 1832, or "any year thereafter,"— that is, 1832, or any year "heretofore"; that is, prior to the passage of the act, and subsequent to the year 1832, or "any year hereafter"; that is, for any year after the passage of the act,—which have not been released or paid, and which were properly chargeable to the land. This clause of the statute clearly points out to the owner what was required of him. The purpose of the next clause is to punish the party for his neglect or failure to comply with his duty "for five successive years." What duty? Clearly, the duty to enter his lands as required by the statute, and charge them with the back taxes. And if he fails to do this for five successive years, the penalty for his neglect is the forfeiture of his land. And for what is this penalty imposed? Is it the neglect to enter the lands for one year, or the failure to have them charged thereon for five successive years? Certainly, the legislature did not intend that the statute should be construed to deprive an owner of his lands for the omission of a single year to enter them on the land books, and retain the taxes paid both before and after the passage of the act. No such injustice could be imputed to the legislature. Such a construction of the statute would be not only unjust, but might be the means of inflicting great wrong upon an innocent owner. We must assume that the legislature, in passing this statute, acted

justly and wisely, and in a spirit of liberality to the delinquent land-owner, when it declared that before the owner could be deprived of his land he must neglect to enter it, not for one, two, three, or four years, but for five successive years. The language employed seems to me to be too plain to admit of any other construction. The law is well settled that in construing a statute we must ascertain, if possible, the intent of the legislature in enacting it, and to so construe it as to give effect to its intention. Looking for the true meaning of this statute, and what justly was its object and purpose, we think the legislature meant that the owner of any tract of land omitted from the proper assessor's book for a period of less than five successive years should not be deprived of his land by reason of such omission, and that it did not work a forfeiture.

Before leaving this branch of the case, it might be well to allude to the act of 1869, and ascertain its purpose. I do not care to review the several acts of 1830, 1831, 1832, 1835, and 1836, relating to delinquent lands, more than to say that prior to the act of 1835 there was no law authorizing the forfeiture of lands for the failure of the owner to enter them on the land books, and have them assessed with back taxes, so that the state could get her taxes from such delinquent lands. The act of 1869, known as the "Huffman Act," was passed with the view to remedy this evil. By that act it was intended to put lands delinquent for the nonpayment of taxes and those that were delinquent for nonentry on the commissioner's books upon the same footing, and for this purpose the year 1832 was fixed as the time in the statute when they would stand upon a common footing. If I am right in the construction of this statute, was the tract of land in question liable to forfeiture when the proceedings were instituted by the commissioner for that purpose? To answer this question we must ascertain against what land the proceedings were had, and if they were taken against the tract of land in controversy. It appears from the papers in this cause that the action of the commissioner was taken against the 480,000 acre tract and the 320,000 acre tract granted to Robert Morris. It does not appear that any proceedings were had directly against the land in controversy, but, if affected by the proceedings, it is only by reason of the fact that it was originally a portion of one of these two tracts or of both of them. At the threshold of this investigation we are met with the fact that Robert Morris had conveyed all of his interest in the two tracts long before the institution of these proceedings; in fact the plaintiffs claim under a deed made by Robert Morris to William Cramond in 1797, more than 80 years before the commissioner instituted his proceedings. This statement of facts puts at rest the right of the state, through her commissioner of school lands, to move against these lands. The title to them had passed out of Morris, and he was no longer chargeable with them for taxes on them after their alienation by him. From all that appears in this case, the lands in the name of others had all been charged with taxes and paid. It does appear that, so far as the tract in controversy is concerned, the plaintiffs, and those under whom they claim, have been assessed with and paid

all the taxes on their lands from 1847 down to the institution of this suit, except 1869, and three years during the war, when no taxes were assessed against the land. What right, then, had the commissioner to proceed against the Morris lands? I answer, none whatever. The lands in the name of Morris having been long before transferred to others, they were not liable to entry in his name, nor had the state any legal claim against them for taxes assessed in his name. The action of the commissioner was based upon facts supposed to exist, but for which in reality there was no foundation, and, as a consequence, was illegal, and of no binding effect upon those who claimed the lands under those who had acquired title thereto more than 80 years before. We must therefore hold that these proceedings were coram non judice, and that the decree of the court declaring a forfeiture was void. But it is claimed that this land was forfeited by reason of the purchase for the state at the sale of 1871 for the taxes of the year 1869, and an effort is made to distinguish this case from Wakeman v. Thompson,[1] 32 W. Va. (Appendix, p. 1). Briefly, to state the position of the defendants, it is claimed that the statute makes a distinction when the purchaser is the state instead of an individual, in this: that it is not required of the sheriff "to return the list of sales with a certificate of his oath attached, which must be returned to the (recorder) now clerk of the county within ten days after the sale." To sustain this position, section 31, c. 31, p. 197, Code 1868, is relied on:

(31) "When any real estate is offered for sale as aforesaid, and no person present bids the amount to be satisfied to the state from the sale, the sheriff or collector shall purchase the same on behalf of the state for the taxes thereon, and the interest and damages on the same, and shall make out a list thereof, under the following caption: 'List of real estate within the county of ――, sold in the month (or months) of ――, eighteen hundred and ――, for the nonpayment of taxes thereon for the year (or years) ――, and purchased for the state of West Virginia.' Underneath shall be the several columns mentioned in the tenth section, with a like caption to each column, omitting, however, the column headed 'Name of Purchaser.' The officer making out the said list shall make oath that it contains a true account of all the real estate within his county purchased by him for the state during the year ――, and return the list, with a certificate of the oath attached, to the recorder of the county within ten days after such sale, who shall, within twenty days after such return, make an accurate copy thereof in a well bound book, and transmit the original to the auditor."

It is true that the caption provided for in this section differs somewhat from that required by section 12 when the sale is made to an individual. It is claimed by the defendants that under this section all that is required is for the return to show the month and year when the sale was made to the state. While this is true as to the caption, still that is not all that is required to be done. The succeeding paragraph, as we have seen, uses the following language:

"The officer making out said list should make oath that it contains a true account of all the real estate within his county purchased by him for the state during the year and return the list with a certified copy of the oath attached to the recorder (clerk) of the county within ten days after such sale who shall

---

[1] See this case, 40 Fed. 375, sub nom. De Forest v. Thompson.―[Ed.]

within twenty days after such return make an accurate copy thereof in a well bound book and transmit the original to the auditor."

When you compare this clause of section 31 with section 14 of this act, it will be found that, while they are not the same in phraseology, they are the same in substance. In both sections the list is required to be filed within 10 days after such sale. This must be done, and it should appear that the mandatory requirement of the statute was complied with, otherwise this provision of the statute would be useless. The effort to distinguish this case from the case of Wakeman v. Thompson, supra, must fail. One of the five irregularities set up in that case was "that the sheriff failed to return his list of lands sold as delinquent for taxes within ten days after the sale and purchase by him for the state," who was the purchaser in that case as well as in the one under consideration. In a well-considered opinion of this court it held "that the neglect of the officer to comply" with that requirement of the statute was "such an irregularity as tends to prejudice the rights of the owner whose lands have been sold." It is true that neither the clerk nor sheriff is required by the express terms of the statute to note the day, but it is nevertheless true that the sheriff is required to return his list within 10 days, which fact must be established before the former owner could be divested of his title, and it passed to the state. It does not follow, because the state became the purchaser at this sale, that the statute should not be as fully complied with as in a case of a sale to a citizen. The irregularity complained of in this case is not that the sheriff or clerk failed to note the time of filing his list, but it is the fact that it does not in any way appear that he did file his list in 10 days. The court said in the Wakeman Case:

"That the former owner had a right to call at the recorder's office after the sale of his lands, and demand the production of the sheriff's report for his examination. If he discovered that there was no evidence when the report was filed, he could rest upon his rights, for the statute required the list to be filed within ten days after the sale. It must in some way affirmatively appear, and not be left to the presumption, that the sheriff had discharged his duty, which ordinarily, in this class of cases, would be a violent one."

We adhere to the ruling of the court in the Wakeman Case, and hold that the irregularity complained of in this case falls within the previous rulings of this court upon this question, and is fully sustained by the supreme court of West Virginia. Barton's Heirs v. Gilchrist, 19 W. Va. 223; Simpson v. Edmiston, 23 W. Va. 675; McCallister v. Cottrille, 24 W. Va. 173; Wakeman v. Thompson, supra, p. 1.

We come now to consider the defense of laches set up by the defendants to defeat the plaintiffs in this action. This is an equitable defense, and is often resorted to when the party who sets it up has no defense in law, and for this reason courts should be very cautious in applying this doctrine to defeat a rightful owner of the land who from neglect which may be the result of the want of proper information refrains from an assertion of his rights until the presumption of abandonment arises from his course of conduct. I am aware of the tendency in the courts of this day to recognize the defense with

growing favor as both meritorious and valid. "Laches," says Mr. Justice Brown in Galliher v. Cadwell, 145 U. S. 368, 12 Sup. Ct. 873, "proceed on the assumption that the party to whom they are imputed has knowledge of his rights, and ample opportunity to establish them in the proper form; that by reason of his delay the adverse party has good reason to believe that the alleged rights are worthless, or have been abandoned; and that, because of the change in condition or relation during this period of delay, it would be an injustice to the latter to permit him to assert them." In a well-considered oral opinion in the case of Halstead v. Grinnan this court held that laches could not be imputed to one who was ignorant of his rights, and for that reason failed to assert them. This case was affirmed by the supreme court (152 U. S. 412, 14 Sup. Ct. 641), in which case the court says: "There can be no laches in failing to assert rights of which a party is wholly ignorant, and whose existence he had no reason to apprehend." Applying the principles as laid down in the cases just cited to the facts in this case, can we hold that the plaintiffs have slept so long upon their rights as to render their claim to this land inequitable and unjust as against the defendants' claim of title? We think not. There is no fixed and unalterable rule applicable to all cases where laches is relied on to defeat a recovery. Each case must stand or fall upon the facts that surround it. In this case it is claimed that the plaintiffs have been guilty of laches, because the land in controversy was sold in 1882 by the commissioner of school lands, and that the plaintiffs took no steps to relieve themselves from the embarrassment arising from that sale until they brought this action, in 1890, a period of eight years. But there is no evidence that the plaintiffs had abandoned their claim of title or their rightful title to these lands during that period. On the contrary, they continued to pay the taxes regularly assessed to the state, which was an undoubted assertion of their right to the land. In this connection it is to be noted that the plaintiffs were ignorant of the proceedings had in McDowell county. But, if they were not, under the construction given by the courts of West Virginia of the statutes under which the proceedings were had, there was no remedy by appeal, as that remedy had been refused by the supreme court of West Virginia in two cases considered by it. After these cases had been decided, the case of Wakeman v. Thompson was instituted in this court, with a view to ascertain if there was not some way to correct the irregular action of state officers in selling lands in this state to satisfy delinquent taxes. That case was pending for several years, covering the time that the defendants rely on in this proceeding as laches to defeat the recovery in this action. It was finally disposed of in 1889, which decision seems to have shed some new light upon the proceedings of the commissioners of "school lands," and opened the way for owners to protect their rights to their lands. The profession, after this decision, began to look into the rights of their clients, which were in a state of suspension after the decisions of the supreme court of West Virginia, and this suit was instituted shortly after that decision, to get rid of the cloud upon the plain-

tiffs' title to this land. During this time the plaintiffs allege they were in the dark, and light only came through the case of Wakeman v. Thompson. In this connection it must be borne in mind that the defendants knew the title under which they claimed the land. They knew that the plaintiffs, and those under whom they claimed to have derived their title, had paid all the taxes charged and assessed against this land for nearly a century, with the single exception in 1869. They knew that the lands were in a state of nature, with little, if any, improvement made upon them. With a knowledge of these facts, they purchased the land at the tax sale, at a very inconsiderable price, most likely as a speculation. I do not overlook the very able and exhaustive argument submitted on this point by Judge Johnson, of counsel for defendants. I confess I was at first impressed with his views, but, after more mature consideration, I reached the conclusion that the facts in this case were very different from most of the cases where the doctrine has been applied, especially in the Dingess Case,[1] decided by my learned brother in this court, and approved by the appellate court. In that case the record disclosed almost a total abandonment of the lands. No taxes had been paid for many years, and no assertion of right to the lands upon the part of those claiming against Dingess. It is one thing to sleep on your rights, but it is quite another thing when you wake up in a reasonable time, and take active steps to protect your rights. In this case the entire period was only eight years, arising out of the fact that the profession had not discovered a remedy until Judge Ferguson, in his bill in the Wakeman Case, became a pioneer to open the way that shed new light upon litigation of this character. Nor will it do to say that ignorance of the law is no excuse. The law as announced in McClure v. Maitland, 24 W. Va. 561, and in McClure v. Mauperture, 29 W. Va. 633, 2 S. E. 761, had been accepted by the profession as final upon the rights of parties where proceedings had been had by the school commissioner, and the lands were sold. This would seem to be a reasonable excuse, not only for ignorance of the law, but for the delay in bringing this suit. By analogy, a man is not supposed to have been neglectful or abandoned his land until entry is barred by the statute of limitations. There was no bar to a right of recovery when this suit was commenced. I must therefore hold, as the taxes have been regularly paid for well-nigh a century, with the single exception referred to, that this fact is not only an evidence, but must be held as an assertion of right, as opposed to abandonment, coupled with the additional fact that the lands are in a state of nature, so far as the record discloses, and that no development or improvement has been made by the defendants prior to the institution of this suit, and that it would be unjust and inequitable to apply the doctrine of laches, and to refuse the plaintiffs' prayer in their bill to vacate the numerous tax deeds and remove the cloud upon their title.

The defendants deny the jurisdiction of this court to grant relief in this case, for the reason, as they claim, the remedy of the plain-

[1] 56 Fed. 171.

tiffs is at law. I do not concur in this position. The plaintiffs in this action have a regular chain of title, unbroken, from the commonwealth of Virginia. It is well settled that, in the absence of an actual adverse holding, the possession will be presumed to be with the holder of the elder title to the land. And in this instance there was no actual adverse holding which could operate to destroy the possession of these plaintiffs. But, even if that was so, still I am of the opinion that the proper jurisdiction in this case is in a court of equity. The primary, and I may say the vital, purpose of this bill is to remove an alleged cloud upon the plaintiffs' title to this land, and at the same time to group all the defendants together, claiming from the same source, in one suit, and save a multiplicity of suits. This court, in Wakeman v. Thompson, held that the jurisdiction of a court of equity can be invoked upon the familiar ground that by suing in equity, and bringing all the defendants before the court in one action, they can avoid a multiplicity of suits. Wakeman v. Thompson, supra; 1 Pom. Eq. Jur. p. 245; Boyce v. Grundy, 3 Pet. 215; Oelricks v. Spain, 15 Wall. 211. Numerous other authorities could be cited to sanction this position, but it is deemed unnecessary. It follows from all that I have said that the plaintiffs are entitled to relief, and a decree will be drawn to conform with this opinion.

I am authorized to announce that Judge GOFF fully concurs in this opinion.