# CHARLESTON

STATE *v.* WEST BRANCH LUMBER COMPANY.

Submitted February 6, 1908.     Decided December 22, 1908.

1. TAXATION—*Forfeiture—Suit by State to Sell Land.*
   Though failure of a former owner of land, conveyed by a fatally defective tax deed, made pursuant to a sale by a sheriff for delinquency, to keep the land taxed in his own name and pay the taxes for a period of five successive years, works a forfeiture of the title, the deed is conclusive evidence against the state that the title of the former owner is in the tax deed grantee, and she cannot maintain a suit to sell the land as forfeited. (p. 699.)

2. SAME—*Suit to Enforce Forfeiture—Grantee in Defective Tax Deed.*
   Section 29 of chapter 31 of the Code, by estopping the state from proceeding against the grantee in a fatally defective tax deed, to enforce a forfeiture in the name of the former owner, releases or grants such forfeited title to such grantee in advance of the accrual of the forfeiture. (p. 700.)

(BRANNON, JUDGE, dissenting.)

Appeal from Circuit Court, Braxton County.

Action by the State against the West Branch Lumber Company. From an order dissolving an injunction, the State appeals.

*Affirmed.*

R. G. LINN, CARY C. HINES, HENRY S. CATO, and W. E. HAYMOND, for the State.

MOLLOHAN, McCLINTIC & MATHEWS, A. W. REYNOLDS, and JOS. S. CLARK, for appellee.

POFFENBARGER, PRESIDENT:

The State of West Virginia appealed from an order made and entered by the circuit court of Braxton county, on the 8th day of December, 1904, dissolving an injunction. The suit, in which the order was made, is one instituted by the state for the purpose of subjecting to sale a tract of 5,000 acres of land, situated in said county, as forfeited for non-entry on the land books of said county, for taxation, from the year 1870 to the year 1903, inclusive. At the time of the institution of said suit, the West Branch Lumber Com-

pany, a corporation, claiming title to the land, was engaged in cutting, manufacturing and marketing the timber thereon, and the state, upon an amended bill, showing this fact, obtained an injunction restraining said company from the further cutting of the timber, which was afterwards dissolved as aforesaid.

The land was granted by the Commonwealth of Virginia to Samuel Young, by a patent bearing date April 13, 1786. Sometime prior to the year 1842, it had become forfeited for non-payment of taxes, and, upon proceedings instituted by the commissioner of delinquent and forfeited lands was sold, under a decree of the circuit superior court of said county, to Gideon D. Camden, to whom a deed was made by said commissioner, dated April 13, 1842. Camden, by deed dated April 15, 1842, conveyed it to Francis Albright. Thereafter it was taxed in the names of Francis Albright and George Giger for a time, and, then as the land of Francis Albright's heirs and George Giger, until the year 1868, for which year, as well as for the year 1867, it was returned delinquent and afterwards sold by the sheriff of said county for the non-payment of taxes thereon for said years. For the delinquency of the year 1868, it was purchased by W. L. J. Corley and M. H. Morrison, who, having assigned the benefit of their purchase to Henry Brockerhoff and others, together with the recorder of said county, by deed dated September 9, 1870, conveyed it to said Brockerhoff and others. After said sale, the land appeared on the land books in the names of Henry Brockerhoff and Co., and for delinquency, in their names, for the years 1875-76, it was again sold on the 6th day of November, 1877, by the sheriff, to A. N. Ervin who obtained a deed therefor, from the clerk of the county court of said county, dated January 3, 1879. He conveyed it to Margaret C. Brockerhoff, by deed dated September 6, 1879. From her, it passed, by *mesne* conveyances, to the West Branch Lumber Company. By the sales made and taxes paid in the names of Brockerhoff and others, claiming under the tax deeds, the state had received payment of all taxes on the land from the time of the purchase thereof by Morrison and Corley. All these facts are set up in the answer of the West Branch Lumber Company. For the delinquency of the year 1867, the land was sold a

second time, at the same sale at which Morrison and Corley bought, and was purchased, by the sheriff, for the state. This fact was shown by an amended bill. Said amended bill also charges invalidity of said tax deed of September 9, 1870, on three different grounds. First: Because the list of sales was not returned by the sheriff to the clerk of the county court within ten days. Second: Because it does not appear from the record of the clerk's office when the sale list was returned. And third: Because, by the sale to the state, for the delinquency of 1867, a prior year, the title vested in the state by purchase. By a special replication to the answer of the West Branch Lumber Company, the state denied that the grantors of said company had full, perfect and complete title to the land; that they had had any title regularly derived under a grant from the Commonwealth of Virginia; that they and their co-owners and those under whom they claim have had ten years possession of the land under color or claim of title; that they had been assessed with it, and paid, the state taxes thereon; and that they, or those under whom they claim, or any of them, had been assessed with it and paid the state taxes for any period.

From a certificate made by the clerk of the county court of Braxton county, the land appears to have been carried on the land books and charged with taxes for the years 1871 to 1904, successively, in the names of Henry Brockerhoff, Mary C. Brockerhoff, Mary Brockerhoff and West Branch Lumber Company, as a tract varying in quantity from 4,655 acres to 4,715 acres. It is said to have been surveyed at times, within the period named, and the entries upon the land books made to conform to the results of the surveys. Under these assessments, the sum of $5,926.23 has been paid in taxes. It does not seem to be disputed, either that this is the land in controversy, or that the taxes have been paid under these assessments.

The state proceeds upon the theory of a forfeiture for non-entry, not in the names of Corley and Morrison, or other tax deed grantees, or any one to whom the claim under the tax deed passed, but upon the theory of a forfeiture for non-entry in the name of the Albright heirs and Giger, the tax deed being considered void, in consequence whereof payment of the taxes by one claiming under it does not, under

the doctrine announced in *Simpson* v. *Edmiston*, 23 W. Va. 675, as it has been applied in later decisions, protect the land from forfeiture.

The legal proposition upon which the bill is predicated has been regarded for some years, by this Court and the profession in general, as sound and as having the wide operation and effect claimed for it; but a long and patient investigation, both before and after elaborate argument by able counsel, has impressed upon me a grave and serious doubt, to say the least, as to its consonance with the spirit of our constitutional and statutory system of law applicable to the subject. Having reduced to writing the considerations and argument, which, in my opinion, weigh heavily against it,. and, at the same time, reflect light upon the true exposition of this branch of the organic and statutory law, as applied to other subjects and questions frequently drawn into this Court for disposition, I have incorporated them into this opinion as suggestions which may prove to be useful in the interpretation of said system, and also as having some bearing upon the correctness of the construction of section 29 of chapter 31 of the Code, here adopted, and denying to the state the right to maintain a suit to sell land, as forfeited,. under the conditions, disclosed by the record in this cause. A decided aversion, on the part of my associates, to the overruling of numerous decisions in which the doctrine of *Simpson* v. *Edmiston* has been adhered to and applied, and some doubt on my part as to the wisdom of so doing, leaves it, as originally stated, unimpaired; but our interpretation of the statutory provision, to which reference has been made,. eliminates the oppressive consequences and effect, accorded to it in some later decisions in which this view of the statute was not presented or adverted to.

That payment of taxes by a *bona fide* claimant of a given title, who predicates his claim upon anything other than a tax deed, protects it from forfeiture not only for his own benefit, but for the benefit of any other claimant of it, has been several times decided by this Court. This doctrine was not denied by Judge Snyder, the author of the opinion in *Simpson* v. *Edmiston*. On the contrary, he asserted and enforced it in *Lynch* v. *Andrews*, 25 W. Va. 751, and *Sturm* v. *Fleming*, 26 W. Va. 54, both of which cases arose since

the adoption of the present Constitution of this State. The true relation of *Lynch* v. *Andrews* to this question will be shown by the following quotation from point 5 of the syllabus: "Land is sold at a judicial sale, the sale confirmed and a conveyance made to the purchaser and he takes possession, the litigation continues, and after the purchaser has been in the actual possession of the land under such conveyance for more than ten years, the decrees ordering and confirming the sale are reversed and declared void, and the sale set aside for the want of jurisdiction in the court to order the sale; during all this time the taxes on the land are paid by the purchaser and the same is not charged for taxes to the owner and he pays no taxes on it. *Held:* I. The possession of such purchaser under such void sale is not adverse to the owner. II. The payment of the taxes by such purchaser inures to the benefit of the owner, and the State can have no claim against the owner for taxes on the land, and his title can not become forfeited for not also paying the taxes on the land." *Sturm* v. *Fleming* was a similar case, point 2 of the syllabus reading as follows: "The payment of taxes on land by a purchaser thereof at a judicial sale, which is subsequently set aside and declared void, will be treated as a full satisfaction of all the taxes on such land for the time they shall have been so paid; and the owner of the land so sold will not forfeit his title thereto by reason of his not having had the land assessed and the taxes paid thereon in his name during the time the taxes were so paid by such purchaser." The possession and payment of taxes under a void judicial sale extended over a period of fifteen years.

The reasoning upon which the court reached this conclusion in *Sturm* v. *Fleming*, was in part as follows: "Both the pleadings and the proofs show that the appellant held and claimed said lands under and by virtue of the sale made by Commissioners Despard and Maxwell, and that said commissioners professed to sell only the title of the appellee, Sturm, in pursuance of a decree entered to sell the land of said appellees. It is plain, therefore, that the appellant never held or claimed said land under any title or color of title adverse or in hostility to the title of the appellee, but that he claimed under the title of the appellee

and in privity with him. The appellant, according to his pretension and claim, was the successor of the appellee to the title, and that the relation between him and the appellee was that of vendee to vendor. In such cases all the decisions agree that the payment of the taxes by one party, either by the vendee or the vendor, will be 'a full satisfaction of the taxes legally chargeable upon the land, and the State could have no further charge for taxes against the land under the title thus held in privity and successively by the vendor and vendee.' "

In speaking of the claimants in *Lynch* v. *Andrews*, the Court said: " In the case at bar, there is no pretense that the appellees and their vendor, James Lynch, or either of them ever asserted any claim or title to the land in controversy in hostility to that of the appellant. They claimed and held it under and not independent of the appellant's title. They claimed they had his title and not a new and distinct title or color of title. They were claiming as vendees in subordination to and under the same title. When, therefore, the same power, the court, which had unadvisedly and without legal authority attempted to effect a transfer of the title, in the same suit corrected its error and declared the pretended transfer inoperative and void, the foundation of the appellee's claim, and the claim itself were wholly destroyed and annihilated."

Passing, for the time being, the alleged distinction between the status of a claimant of a title by a tax-deed and other claimants, the import of the two decisions just referred to is that payment of taxes on land, in order to prevent a forfeiture of the title, under section 6 of Article XIII of the Constitution, need not be made by the veritable owner of that title; and that it suffices to save it from forfeiture, that somebody *bona fide* claiming the title has paid the taxes on the land as such claimant, although it may turn out ultimately that he was not the real owner. These decisions seem to indicate strongly that the term "owner" used in section 6 of Article XIII includes such a claimant, and that the title, if forfeited and vested in the State, is wholly forfeited, and not merely forfeited as to one man or any number of men, provided the number does not include all of the *bona fide*

claimants. In other words, the logic of these decisions is, that payment of taxes by one *bona fide* claimant of a given title saves it from forfeiture, not only for his benefit, but for the benefit of any other person who may be able to establish a valid claim to that title.

That the Court will not, in determining whether there has been a forfeiture, or a valid assessment so as to pass title by tax sale, extend its inquiry far enough to say that the man who pays the taxes, or in whose name the sale was made, is the true owner, is apparent from what was said by JUDGE JOHNSON, speaking for this Court in *Bradley* v. *Ewart*, 17 W. Va. 598: "We do not decide in this case, that the title of the defendants to the land in controversy is good, but that as appears from the records, so far as the state is concerned, *they seemed to be the owners for the purpose of taxation*, and that the State under the sale to Bradley could make no title to him, because it appears, that the *taxes assessed upon this same title had been properly paid by the defendants* for the years 1865 and 1866, on account of the alleged non-payment of which the land was sold and purchased by Bradley. The sale and deed to Bradley were therefore illegal and void. The deed being void on this ground it was wholly unnecessary to enquire whether it is void for any other reason." In *Sturm* v. *Fleming* that case was cited and in both *Sturm* v. *Fleming* and *Lynch* v. *Andrews*, payment by mere claimants who, by reason of the voidness of the decrees under which they had purchased, had no title and no valid claim to the title, saved the land from forfeiture for the benefit of other claimants of the same title, who had not paid a cent of taxes and in whose name the land had not been entered for fifteen years, in one case, and more than ten years, in the other.

In *Lohrs* v. *Miller*, 12 Grat. 452, cited in *Bradley* v. *Ewart*, *Sturm* v. *Fleming* and *Simpson* v. *Edmiston*, this view is further illustrated. The facts are concisely, but accurately, stated in the syllabus, which reads as follows: "H is the owner of a tract of land in 1797. Two papers purporting to be deeds bearing date in that year, one from H to G and the other from G to M, conveying this land, are by order of the proper court directed to be admitted to record, and are recorded; though they are not duly authen-

ticated.   Menters the land as his on the books of the com-
missioner of the revenue; and in 1815 it is sold as the land
of M as having been forfeited for non-payment of taxes,
and conveyed by the sheriff to B, who enters it on the books
of the commissioner, and it has been ever since held by B
and those claiming under him; and all the taxes charged on
the land have been paid or released.   In 1843 a patent is
obtained for the land by L, who enters it with the commis-
sioner and pays the taxes thereon regularly.   *Held:*   That
under the circumstances the title of the parties claiming
under B is valid; and the land was not forfeited under the
act of 1835, as the land of H, to the junior patentee L."
It was an action of ejectment.   Arnold had procured a
grant from the state in 1797.   He conveyed the land to Ig-
natius Hayden, who conveyed it to Ignatius Gough.   Gough
conveyed it to Hyatt.   The deeds to Gough and Hyatt were
improperly admitted to record because they had not been
duly authenticated.   The land was taxed in the name of
Hyatt and returned delinquent and sold in his name as for-
feited land for non-payment of taxes.   The defendants
claimed under the purcheser at the tax sale.   No irregularity
in the sale proceeding was relied upon by the plaintiffs, but
they insisted that the assessment was improper and that,
therefore, there was no forfeiture for non-payment; but that,
as it did not appear that Hyatt was the veritable owner of
the title which Hayden and Gough had attempted to pass
by their deeds, there was a forfeiture for non-entry for
the purposes of taxation, because the land had not been
kept on the land books in the name of Hayden, the alleged
true owner of the title.   In view of the fact that all the
taxes, not released, had been paid on the land by the defend-
ants and those under whom they claimed, so that there had
been no omission of the land from the land books, the
Court said, in effect, that the payment of the taxes by these
*bona fide* claimants of the Arnold title, had prevented for-
feiture for non-entry, and it would not enquire whether the
defendants were the real owners.   That they were
claimants of that title in good faith and had paid the taxes,
sufficed to prevent any forfeiture of that title.   A part of
the opinion in the case is quoted by JUDGE JOHNSON, in
*Bradley* v. *Ewart*.   In order to show clearly just what

views the court entertained, the following additional quotation is made from it: "If in any case the construction of a statute be doubtful, it is well for the court, in applying the law to the facts, to enquire whether the legislature, having the same facts in its mind, would have placed them under the operation of the law. If we do so in this case, and shall decide that the land was forfeited, we must hold that the legislature meant to forfeit lands as · for an omission to enter and consequent non-payment of taxes, in a case in which the entry was in fact made and the taxes in fact paid."

"It is said that if the defendants below had proved title in Meshach Hyatt, derived from Ignatius Hayden, that then the entry on the land books in his name had been valid and the forfeiture prevented. It is further said Meshach Hyatt was not such owner or proprietor within the meaning of the law as might make such entry. That the chain of title stops with Hayden, and that he alone could make a valid entry; and that having omitted to do so a forfeiture is incurred. These positions of the plaintiff's lessors, when properly analyzed, are found to be, that the commonwealth has a concern in lands above and beyond the taxes charged thereon; that although she may and does receive 'her just demands' against any specific parcel of land, yet she may by forfeiture acquire the land itself in addition to her taxes, and this although the taxpayer regarding himself as owner, in good faith, has complied with the letter of the law; that she may set up a title in a party who long since attempted to divest himself of all title, who has never since set up any claim; and this for the purpose of forfeiting such title to the prejudice of subsequent claimants who have fully discharged all just demands against the subject; that in every case of devise, descent, lineal or collateral, or of conveyance, if a party not in law entitled to succeed to real property, shall yet in good faith claim title, cause it to be entered and charged with taxes which he duly pays, yet the title of the true owners is forfeited for omission to enter it on the commissioner's books."

"In fine, it is insisted, in effect, that the commonwealth is a grand beneficiary to take advantages of all mistakes, mis-constructions, or imperfections, touching titles or

the transactions of titles; and this without regard to the fact that her revenue derivable from the subjects of the titles has been fully paid; that the registry laws provided for the security of creditors and purchasers, shall be held to apply to the commonwealth's claim of forfeiture, with only this difference, that in the latter extrinsic proof may be heard to defeat the forfeiture."

"I am clearly of opinion that a forfeiture in this case cannot be adjudged to have occurred, without a departure from the letter and spirit of the laws: such judgment could only be sustained by making the statute rigorous and unjust in the last degree. Thus, I am of opinion to reverse the judgment of the Circuit Court, and to render judgment for the plaintiffs in error."

*Hitchcox* v. *Rawson*, 14 Grat. 526, in which Judge Lee wrote the opinon of the court, contains a strong intimation to the same effect. A claim of forfeiture for non-payment of taxes, not non-entry for taxation, was resisted because the assessment on which the forfeiture was predicated was in the name of the patentee who had sold and conveyed away the land before the assessment was made. It was insisted that, as the assessment was illegal, no forfeiture could stand on it. But Judge Lee said, without deciding the question: "It. may not follow as a necessary consequence that an assessment of taxes upon a tract of land would in every case be illegal and void because the land had been previously conveyed to another by the party in whose name it was so assessed." The reason for this suggestion will be apparent to any one who makes a careful study of the laws of the State of Virginia, out of which our system of forfeiture was evolved.

No rule of construction is better settled or safer to follow than that the evil intended to be suppressed by the statute in any given case shall be constantly kept in view. As shown by the opinion of JUDGE SNYDER in *McClure* v. *Maitland*, 24 W. Va. 561, one of the objects of the forfeiture and transfer provisions of the Virginia statutes was the settlement of land titles. There were, in those days, as there are now, numerous instances in which some of the land had been granted by the State of Virginia to two or more persons, by patents issued at different dates; and conflicting titles, or

apparent titles thus created, all purporting to have emanated from the state, bred great uncertainty, which retarded the development and settlement of the state. Most of these were in what is now West Virginia, the territory lying west of the Allegheny Mountains. As a means of getting rid of those titles by vesting them in the same person, the statesmen of Virginia very wisely concluded incidentally to effect forfeitures of some of them in the exercise of the sovereign power of taxation. The state, therefore, provided by law that any title on which taxes had been, or should be, assessed and not paid, should be forfeited to the state. Later, in view of the fact that there were many large grants, under which the land had never been charged on the books of the commissioners of the revenue in anybody's name the owners or proprietors thereof were required to enter them on the books for taxation, and given a limited time in which to pay the taxes, and it was then declared that the title to any tract not so entered upon the land books and the taxes thereon paid, within the time allowed, should be forfeited to the state. These forfeitures were aimed, not at claimants to the titles, but were directed against the titles themselves. It was not conflict between claimants to the same title, that produced the evil. Any *bona fide* claimant of any title could prevent the forfeiture of it for non-payment of taxes by paying them, and, for non-entry, by having the land charged to him and paying the taxes.

Prior to the year 1831, many acts of the legislature had been passed declaring forfeiture for non-payment of taxes. Some of these forfeitures had been released by other acts. In 1831, large amounts of taxes which had been assessed on the lands of the state remained unpaid. For a great many years these taxes had been charged and accumulated, and constituted liens upon the lands. By that act, passed on the first day of April, 1831, the great scheme of forfeiture and transfer for the purpose of enforcing the payment of these taxes, and, incidentally, destroying the conflict between titles, was passed. Then in 1835, February 27th, the plan of forfeiting lands that never had appeared on the land books in anybody's name was adopted by an act passed on that date. These two acts laid the foundation for the whole system. The principles and the policy em-

bodied in them have ever since been preserved, although there have been many variations and modifications thereof. By chapter 114 of the Code of 1849, the substance of these acts, as well as some of the later ones, except as to the infliction of forfeitures, was compressed into seventeen short sections. In the Code of 1860, some additional sections were inserted, embodying the provisions of acts passed in 1852 and 1857. Chapter 114 of the Code of 1860 constituted the law on this subject at the time of the formation of this State. By the Constitution of 1863, that policy was very materially departed from. The provisions of that Constitution have practically no bearing upon this question. By the Constitution of 1872, the substance of these Virginia statutes was incorporated into the six short sections of Article XIII. That Article preserves, as did the Constitution of 1863, all rights acquired under the Virginia statutes, and those statutes remain to this day as muniments of title to lands in this state. The forfeiture policy of the Virginia law was inserted in section 6 of Article XIII of the Constitution and the transfer principles were embodied in section 3 of that article.

Section 6 makes it the duty of every owner to cause his land to be entered upon the land books for taxation and to pay the taxes thereon, and denounces against him, as a penalty for failure in this respect for the period of five successive years, the forfeiture of his land and vesting of the title thereof in the state; but it does not define the term "owner." As has been already shown by the decisions of this Court, persons other than the true owner may prevent a forfeiture by causing the land to be entered in his name and paying the taxes. As, in order to accomplish that result, the taxation need not be in the name of the true owner; who is an owner within the meaning of that section? By whose entry for taxation will the forfeiture be prevented? What is the extent of the latitude allowed? That there is some is evidenced by several decisions of this Court. That is incontrovertible, and the only question is its extent. As the Constitution does not indicate that, where ought we look for it? Where is it likely to be found except in the principles and policy of the statutes out of which the Constitution grew? Who was an owner for the pur-

poses of taxation, for the purposes of asserting forfeiture for non-payment of taxes, and for the purpose of preventing a forfeiture by the payment of taxes, under the Virginia statutes? The answer to these questions will give the definition of the term "owner" as used in our Constitution.

As has been stated, the first great forfeiture act was not for non-entry, but for non-payment of taxes that had been assessed. These assessments had been made from time to time, we may say, from the date of the independence of Virginia as a commonwealth, a period of fifty years. Certainly, they had been assessed and charged for more than thirty years. They were charged to somebody in every instance and, upon that charge, was based the declaration of forfeiture. The person to whom they were charged must necessarily have been deemed the owner for the purposes of taxation and for the purposes of enforcing the forfeiture for non-payment. The assessments in those days were made, no doubt, in much the same manner in which assessments are now made. Nowhere, in any state in the Union, is the verity of ownership determined in charging a tax upon real estate. The charge is always made against the man who appears to be the owner and claims to be. In some instances, the bases of the claim to the title are wills, in others deeds, in others contracts, and in others consanguinity, blood relationship. Titles to all the land so charged had come into private ownership by grant, either from the English Crown or from Virginia as a colony or a state. The forfeiture act of 1831 only applied to lands west of the Allegheny Mountains. Many of the titles to these lands had been granted before the year 1780. They began immediately after the commencement of the Revolutionary War. Some, no doubt, had been granted before that time. Some of these lands had been charged with taxes from the time of the issuance of the grant down to the year 1831. The titles created by these grants had then, for almost half a century, changed hands by descent, by device, by deed, by judicial sales and in all the other usual modes of alienation. There were then, as there are now, hundreds of controversies respecting the ownership of particular titles, two or more persons claiming against one another the same title. The

assessment was made according to apparent and reputed ownership and *bona fide* claims, just as assessments are made in these days. It was upon those assessments that the legislature of Virginia declared the land forfeited for non-payment of the taxes assessed. How can it be otherwise than that she deemed the persons in whose names the assessments were made the owners of the land for the purposes of taxation and forfeiture? There was no effort to collect taxes on the lands from any one else. Neither the act of 1831 nor any other act of the legislature ever declared a forfeiture of any tract of land on which taxes had been assessed and paid.

Having thus seen who was deemed the owner in declaring forfeitures for non-payment of taxes, let us see who was considered owner in declaring forfeiture for non-entry for the purposes of taxation. The first act declaring forfeitures for non-entry was passed on the 27th day of February, 1835. In the preamble of that act, it was recited that there were many large grants of land lying west of the Allegheny Mountains, which either never had been entered on the books of the commissioners of the revenue, or had not been so entered for many years past. They had not been entered in the name of any person claiming title under those grants. The act then imposed upon ever owner or proprietor of such land the duty of causing it to be entered on the commissioner's books and paying the taxes. The penalty for omission in this respect was forfeiture of the title to the land claimed under the grant. The act required such lands to be so entered by the persons by whom they were then owned *or claimed* through title derived mediately or immediately under grants from the commonwealth. Under it, there could be no forfeiture if the entry was made as directed by it. It might be made by one who merely claimed the land in the manner indicated. Therefore, a claimant could defeat the forfeiture by having the land entered. Such a claimant, therefore, as is described in that act, must have been deemed an owner or proprietor. This conclusion is in strict accord with the views expressed by Judge Samuels, in *Lohrs* v. *Miller*, by JUDGE JOHNSON in *Bradley* v. *Ewart*, and by JUDGE SNYDER in *Lynch* v. *Andrews* and *Sturm* v. *Fleming*.

These forfeitures were effected for two purposes, one of which was to secure payment of taxes on every foot of land in private ownership within the limits of the State. More than this, the state did not require, except as a means of settling conflicting titles. To accomplish the vesting of two or more conflicting titles in the same person and thereby eradicate, as far as possible, the great evil from which the state was suffering, she did impose an additional tax on lands, covered by more than one grant, for every second and third grant thereof and so on. This was not done for the purpose of getting double or treble taxes, but for the purpose of wiping out the conflict between titles · created by these grants. What did she do with these forfeited titles? She never collected taxes on the lands under them, nor did she sell the lands to which they related and turn the proceeds into the treasury, when it was possible for her, by giving them away, to settle a conflict between titles, by vesting two or more in the same person. She never sold the lands to which the forfeited title related, except when it was impossible to bestow them in such manner as to eradicate such a conflict. One tax was all she wanted except as a means of destroying conflict between titles. The act of 1831 provided that, as fast as these titles should pass into the hands of the state by forfeiture, they should be transferred to and vested in other persons, without the payment of any money, and who were such persons? I answer in the language of the statute: "Any and every person or persons, other than those for whose default the same have been forfeited, and their heirs or devisees, who are now in actual· possession and occupation of the forfeited lands, or any part or parcel thereof, for so much thereof as such person or persons have just titles or claim to, legal or equitable, *bona fide* claimed, held or derived, from or under any grant of the commonwealth, who shall have discharged all taxes duly assessed and charged against him, her, or them, upon such lands, and alll taxes that ought to have been assessed and charged thereon, from the time when he, she or they acquired his, her or their title thereto, whether legal or equitable." Section 9 of that act provided for a like transfer of all titles that should thereafter be forfeited. In both of these provisions, there was

an exception to be hereinafter noted. So, under the act of February 27, 1835, the statute provided for giving away the titles that should be forfeited under it, to the same class of persons as was described in the act of 1831, but in that act there was an exception as in the act of 1831. It was not the policy of the state to exact more than one tax on any piece of land except for the purposes of forfeiting titles to get rid of conflict. That she did not seek profit or aggrandizement out of these forfeited titles, when it was possible to dispose of them otherwise than by sale, makes it highly improbable that she ever intended to exact more than one tax under the same title.

Further support of the view, herein presented, is found in the exception from the operation of the transfer provisions of the act of 1831. The state was willing to bestow the forfeited title upon the holder of another title by grant who had settled upon the land and paid taxes on it under his title. He was not required to be anything more than a *bona fide* claimant under that title. It was not necessary that he be the owner *de jure.* But the state would not confer it upon him, though he were the real owner, if, by doing so, she would prejudice any other person claiming a third title created by her by a third grant for the same land, who had paid taxes on the land under his title. It was not necessary that the third claimant be the true owner of that title. It sufficed that he was a *bona fide* claimant under that grant and had paid the taxes. That proviso reads as follows: "That in case of any controversy arising between any person or persons, to and in whom the right, title, and interest of the president and directors of the literary fund shall be transferred and vested, in pursuance of the provisions of this act, and any other person or persons *bona fide* claiming the same lands, mediately or immediately, under grants from the commonwealth, and having had the same duly entered on the books of the commissioners of the revenue, and having paid and discharged all taxes thereupon charged, and justly chargeable against him, before the right, title and interest of the said president and directors shall have been so transferred to, and vested in, the adverse party, the person or persons, who shall have obtained the transfer to him, in pursuance of the provisions of this act, of the

right, title and interest of the said president and directors, of and in such lands, shall not be allowed to avail himself or themselves of any right or title so by him or them acquired, against such other person or persons so *bona fide* claiming the same lands, mediately or immediately, under grants from the commonwealth, and having had the same duly entered on the commissioners' books, and having paid and discharged all the taxes thereupon charged and justly chargeable against him."

All these provisions were carried into the Codes of 1849 and 1860 in concise and comprehensive terms. Much of the verbiage of the old acts was eliminated. Section 1 of chapter 114 in both Codes provides for transfer of all forfeited titles in the hands of the state to any person, other than those for whose default the same had been forfeited and their heirs or devisees, for so much as such persons. had just title or claim to, from or under grants of the commonwealth, before or after the date of the passage of the act, and who, from the time of such title or claim, should have paid all the taxes duly assessed against such land and all taxes that ought to have been assessed thereon. The policy of giving away the forfeited titles instead of selling them was continued whenever it could be done without prejudice to a third party claiming *bona fide* the same land under a third or other grant. Section 2 of that chapter provided for this and reads as follows: "The preceding section shall not impair the right or title, legal or equitable, of any other person who shall by title, legal, or equitable, derived from or under the commonwealth, *bona fide* claim any such land on which the taxes have been fully paid according to law; but in all such cases of conflicting claim, the parties shall be left to the strength of their respective titles." Payment of taxes by a man who merely claimed in good faith a title other than the one forfeited, however bad that title might be, and however unfounded his claim to it, made that man, in the estimation of the state, worthy of a gift by her of a good title which another man had held, but which had been forfeited for his non-payment of taxes on the land to which it related, or his failure to have it entered for taxation. But the state would not make that gift, in such manner or to such an extent, as would

injure a mere claimant of a third bad title under which he had likewise paid taxes. His payment of taxes protected him from the operation of the statutory forfeiture and transfer, although his title was worthless as against the other titles, and although it might turn out that his claim under this worthless title had no foundation in fact or in law. It was enough that he believed his claim to it to be good and had some reasonable ground for that belief.

In formulating and putting into effect this policy, the state was exercising its sovereign powers for the promotion of the welfare of the body politic. She was not acting as a mere proprietor of land or dealer in land titles. Aside from obtaining the revenue which she was entitled to have, her only purpose was to promote and encourage the settlement and development of the state, by eradicating the great evil of conflicting titles, created by herself through her improvidence and want of foresight. Regarding her as exercising sovereign powers in ordaining these laws, we must assume that she intended to deal justly and fairly with every citizen. We are not at liberty to impute to her an intent to make any arbitrary discrimination between persons standing in substantially the same situation. A man who paid taxes under a good title ought to have stood in equal favor at least with a man who paid taxes under a bad title. A *bona fide* claimant under a bad title, by paying taxes to the state, obtained the transfer to himself without money and without price, of a good title, if the state had acquired it by forfeiture. Why then, should the state forfeit a good title under which a *bona fide* claimant had paid all the taxes that ever had been assessed and should have been assessed on the land to which it relates? The forfeiture of his title, in order that it might be bestowed upon another man who had no title, simply because he had paid taxes, would have been an act of most arbitrary injustice and discrimination between two people who were at least equally meritorious respecting the very matter upon which forfeitures and transfers were predicated. An act on the part of one which merited and justified a donation on the part of the state, if performed by another man, should at least have been cause for keeping in its sheathe the sword which had been provided for the destruction of titles.

The theory of taxing and forfeiting claims to the same title, in addition to taxing the several titles, had another element of injustice and oppression in it which cannot be imputed to any sovereign in this enlightened age. One of the ends of goverment is the protection of the weak against the strong. Those who are unfortunate in any respect are objects of the constant solicitude and care of a just sovereign. In every well ordered government ample means for their protection is provided, and at the public expense, if necessary. By taxing every claim to title, the state would have made it necessary, when two or more persons, claiming the same title, were litigating over it, for each to keep the land entered for taxation and pay the taxes on it pending the litigation, however long it might last. The number of taxes imposed under one title would be determined by the number of claimants thereof. In some instances, the taxation would be double, in others treble, and in others quadruple, and this great burden of taxation would be imposed upon these people for no conceivable reason other than that they are unfortunate enough to have a controversy about their property rights. What does it matter to the state which obtains that title? She is not in any way involved in it. She has no pecuniary interest in it and the controversy casts no imputation upon her honor. What pretext could she assign for such conduct other than the basest of greed and avarice? Such a discrimination between that class of people and people who have no controversies growing out of wills, deeds and inheritances and the like, would be most arbitrary and uncalled for. It could not be justified upon any ground, nor could any pretext be found for it, having a semblance of justice or sound state policy. There was a reason for imposing a tax under each grant made by the state for the same land. The state herself had infused uncertainty into the land titles of the state by making more than one grant for the same land. She was under an obligation to the man to whom she had given a junior grant to perfect his title and make it good if the [opportunity ever came. Her honor was at stake. She owed a duty to her grantees in that sense. She was under a duty also to the people generally to straighten out, as far as she might be able to

do so, the tangle into which she had thrown land titles in the state.

The disposition made of forfeited titles by section 3 of Article XIII of the Constitution shows that the purpose of the forfeiture, by force of section 6 of that article, is not to make profit to the state by means of the imposition of a tax on land for every title under which it is claimed. As fast as forfeited titles are gotten into the hands of the state in that way, they are handed over, as upon a silver platter, as a free gift, to anybody who is in a position to take them. And when nobody is in a position to take a forfeited title, the state still abstains from making profit out of the forfeiture. Her sense of justice impels her to reject such a proposition with scorn. In that case, she is content to sell the land, and, after ·deducting the taxes due her and the costs of the proceeding, to hand over the surplus to the former owner, notwithstanding· his unworthiness, in having failed and refused to perform his duty to the state by payment of the taxes on the land. Although he has refused to render unto Caesar the things which are Caesar's, Caesar, as a proud and just sovereign, scorns to punish him by taking money from him beyond the just demands of the state. In view of this policy, it would be strange and inconsistent to impute to the state an intention to become a mere dealer and trafficker for profit and self-aggrandizement, in the lands of the state, held in private ownership. If we say that she intended to tax every claim to every title, as well as every title, we make her such a trafficker and a most greedy and avaricious one. She becomes an insatiable cormorant, laying her hands upon everything she can find a pretext, however base, for consuming.

The provisions of section 3 of Article XIII of the Constitution show also a most careful and undeviating abstention from disturbing, by the bestowal of forfeited titles, the pretentions of any person who has paid taxes on lands under a *bona fide* claim to the same land under a title other than the one forfeited. As in the Virginia statute, the sense of justice and right, characteristic of every enlightened sovereignty, restrains the state from an arbitrary discrimination between her citizens, standing in the same, or simi-

lar, situations. As she will not bestow a forfeited title so as to disturb a claimant under another title who has paid taxes under it, she will not forfeit a good title as long as any claimant under it pays the taxes on the land to which it relates. In both instances, the titles under which the respective claims are made, have yielded to the state what she demands of them, and, as she will not disturb one by transfer of another, for that reason, when two persons are so equally meritorious, she will not disturb, by forfeiture, a title under which claimants thereof have paid all taxes. Surely, payment of taxes under a good title ought to be as potent to prevent a forfeiture as payment of taxes under a bad title is to restrain the state from disturbing it by the bestowal of a gift.

Who is a *bona fide* claimant, in the sense that he may prevent a forfeiture by paying taxes, is answered by *Sturm* v. *Fleming*, *Lynch* v. *Andrews*, *Hall* v. *Hall* and other cases hereinbefore referred to. The defects in the claims to titles in those cases were apparent. They were matters of record. The claim need not be under a deed, will, decree or other paper apparently free from defects and imperfections. In this instance, as in the law of adverse possession, honest belief of the claimant, as to what the law is, as applied to the instrument under which he claims, entitles him to the status of a *bona fide* claimant, however mistaken his judgment may be. He may also have notice of the existence of an adverse claim to the same title. The claimants did have such notice in *Lynch* v. *Andrews* and *Sturm* v. *Fleming*. This Court has said that a *bona fide* claimant in the law of adverse possession need not believe his claim to be a good or valid one. He may know that some other person has a better right, and it is not necessary that he should think his claim good in its inception, for it generally begins in, and presupposes, wrong. The only qualification is that it must not be fraudulent nor involve any breach of trust, and as to this latter, there are some few exceptions. *Swan* v. *Young*, 36 W. Va. 57. The Supreme Court of the United States, in *Searl* v. *School District*, 133 U. S. 553, approved the following definition of good faith, in the law relating to re-imbursement for improvements put upon land, not belonging to the person in possession:

"Good faith is doubtless used here in its popular sense, as the actual, existing state of the mind; whether so from ignorance, skepticism, sophistry, delusion, fanatacism, or imbecility, and without regard to what it should be from given legal standards of law or reason." In *Wright* v. *Mattison*, 18 How. 50, the Supreme Court of the United States held that while defects in the title cannot be urged against it as destroying color, they might have an important and legitimate influence in showing a want of confidence and good faith in the mind of the vendee, if they were known to him, and he therefore believed the title to be fraudulent and void; but it approved the doctrine of the Illinois court in *Woodward* v. *Blanchard*, 16 Ill. 424, holding that the state of mind of the party in relation to such title was an existing truth which must be ascertained and found as a fact in the cause.

. In the early Virginia legislation, from which the propositions embodied in Article XIII of our Constitution were taken, with some modifications, forfeited titles were bestowed upon *bona fide* claimants under grants from the state and such claimants were protected from the effect of transfers wherever they might conflict with such a claimant. Our Constitution has omitted the words "*bona fide* claimant," and substituted therefor the terms "claimant under color of title," which is the status of one who relies upon the doctrine of adverse possession, and is held to be a claimant in good faith, however defective his color of title may be, so long as his claim is not predicated upon a fraud or breach of trust, which is in equity the same thing. It is beyond question, therefor, that the *bona fide* claimant, within the meaning of the Virginia statutes, and therefore of the Constitution, need have nothing more than an honest belief in the verity of his claim, founded upon reasonable grounds therefor.

Why may not one who claims under a defective tax deed be such a claimant? The first intimation in the decisions of this Court that he could not be such a claimant was expressed in *Simpson* v. *Edmiston*, 23 W. Va. 675. No suggestion of such a thing had ever been made by any decision of the Virginia court. This, JUDGE SNYDER, admitted. He denied to such a claimant that status on the technical

ground that there was no privity between him and the former owner. In that case, he did not suggest that the tax deed purported to create an independent title. He said there was no privity because the tax deed was void and did not pass the former owner's title. The converse of that proposition would be that, if the tax deed were valid, and did pass the former owner's title, there would be privity. He failed to distinguish between adverse titles and adverse claimants to the same title. The latter kind of adverseness would exist in the case of conflicting claimants to the same title under a deed executed by private persons, under a will, under a decree of a court, and under any other kind of an instrument. There was adverseness of claim, but it was indubitably a case of adverse claim to the same title. JUDGE SNYDER never suggested the idea of an independent title, as the result of a tax sale, until he came to the two latter cases of *Sturm* v. *Fleming* and *Lynch* v. *Andrews*, in which he was unwilling to extend the principle he had laid down in *Simpson* v. *Edmiston*, and sought a ground of distinction. There, he said the tax deed started an independent title; but, in doing so, he ignored a former decision of the Court which had expressly decided that a tax purchaser takes the title of the former owner. *Smith* v. *Lewis*, 2 W. Va. 39. It had also been decided by the Virginia court in *Gates* v. *Lawson*, 32 Grat. 12. And he evidently concurred in the decision of *Summers* v. *Kanawha County*, 26 W. Va. 159, point one of the syllabus of which reads as follows: "The purchaser of land sold for taxes, who has obtained his tax deed therefor, and had the same duly recorded in the proper county, becomes invested with such estate in and to the land so purchased by him, as at the commencement of, or at any time during the year for which the said taxes were assessed, was vested in the party assessed with said taxes." Moreover, the suggestion was in contradiction of the express terms of the statute. Code, chapter 31 section 25. In making this suggestion, he gave no exposition of the doctrine of privity whatever. It is defined to be a succession of one person to a right or title previously held by another person. Bouv. Law, Dic., title, Privity. If the right succeeded to is one of contract, the result is privity of contract. If it be the estate of the former per-

son, the result is privity of estate. If it be a succession
to the title, no matter whether by contract or operation of
law, there is privity of title. Of course, it must be the
same title, but privity in title need not carry with it all the
contracts relating to it, nor need it be limited to the estate
which the former owner had in and under that title. The
title in the hands of the successor may be free from pre-
existing liens and encumbrances and stripped of the col-
lateral contracts relating to it, such as covenants of seizin,
for quiet enjoyment, against encumbrances and of warranty,
and yet be same title. The test is not the identity of the
thing in all respects, but the relation of succession to it,
no matter whether by operation of law or by contract.
Some courts propound the doctrine, lately adopted by
this Court in one case, *State* v. *Harman,* 57 W. Va. 447,
that a valid tax deed starts a new and independent title.
That this is a mere fiction is baldly apparent. Where does
that title come from? There never was but one true title
to any piece of land. Originally, that was vested in the
state, and she granted it to a private person. Except
by purchase, forfeiture or some other means, it never gets
back into the state, and it must remain in the hands of
the person to whom it was granted or some person claim-
ing under him, mediately or immediately. Let us say that,
immediately before the sale, it was vested in the man in
whose name the property was taxed and sold. This Court
has decided that the state, in selling land for non-payment
of taxes through the sheriff of the county, sells it as the
property of the person in whose name it was assessed, and
not as her own property. *McClure* v. *Maitland,* 24 W.
Va. 561. That being true, the title must be in him, and
not in the state, at the time of the sale. If, by the sale, the
state creates a new title, where does it come from? Not
from the state, because she had none. Not from any person
else on earth except the man in whose name the land was
sold, for no other person had any title. If reason and logic
are to have any effect, they compel the conclusion that the
tax sale passes the title of the former owner, just as the
statute says it shall do. JUDGE SNYDER sets up the
legal doctrine of privity against that conclusion and noth-
ing else, and yet, at least, he tacitly admits, in *Simpson* v.

*Edmiston*, that if the sale had been valid, the title of the former owner would have passed to the purchaser, and it would have resulted in privity. While it did not pass, if it be admitted that a valid deed would have passed it, then it necessarily follows that there was a claim of title in privity, because it was a claim of the right of succession to the title which the former owner had. It might as well be said that there was no privity between the parties in *Sturm* v. *Fleming* and *Lynch* v. *Andrews*, because the claims to the titles there involved turned out to be bad, in consequence whereof the titles did not actually pass. In holding that forfeiture for non-entry did not occur in them, the court undoubtedly marked a distinction where there was no difference.

While there are many decisions, holding that a tax deed starts a new title, as is shown in section 420 of Black on Tax Titles, it is to be observed that the author of that work says the statement is only admissible as a figure of speech; in other words, that the idea is a mere fiction, raised by the courts for the purpose of working out certain proper results. This is often done. There are numerous instances of it to be found in the law. But a court will never set up a fiction for the purpose of working an injury to anybody; nor will it allow a fiction which has been set up by them to be used for that purpose. Bouv. Law Dic. title, fiction. *Gibson* v. *Chouteau*, 13 Wall. 92; *Hussman* v. *Durham*, 165 U. S. 144. The one under discussion here has been created for the purposes of getting rid of liens and encumbrances on the land sold, as well as extinguishing the covenants relating to the title of the former owner. No reason has ever been assigned by any court why it should be extended so far as to deny privity of title between a tax purchaser and the former owner. To cut off the covenants collateral to the title, which constitute no part of it, but have been annexed to it as a mere means of indemnity for the loss of it, it suffices to say that there is no privity of contract between the former owner and the tax purchaser. For the purpose of extinguishing the liens against the land in the hands of the former owner, it is enough to say that the state has, for her taxes, priority of lien, and that a sale of the land, in the mode and manner provided for the enforcement of her

lien, extinguishes and bars the liens of all private persons. The exigencies of the public business require such promptness and punctuality in the payment and collection of the revenues as forbid indulgence in the slow process employed for the enforcement of private liens. The state cannot wait on the adjustment of controversies between contending lienors, resulting in appeals and long drawn out legal contests, and finally upon the collection of the money in installments, payable in one, two and three years. She must have her money when it is due and, therefore, provides for the sale of the land for cash, at the same time giving notice to all other lienors, by solemn laws ordained and proclaimed, that they must protect their interests, either by paying the taxes on the property or redeeming it from sale therefor, within the time allowed for that purpose. This doctrine is amplified and stated with irresistible logic in *Gledney* v. *Deavors*, 8 Ga. 479. Nor is it necessary to set up this fiction in order to make the sale pass a greater estate in the land than the person in whose name it is sold owns, for the law has declared in whose name the tax shall be imposed and given notice that, although assessed in the name of a person who has only a life estate, the tax shall be deemed to be on every interest that anybody claims in the land, and that a sale for the non-payment thereof will pass to the purchaser, not only the estate of the life tenant, but the complete title, covering the estate of remainderman, as well as that of the life tenant. In other words, the state says to the remainderman, as well as to the lienor, you must either pay the taxes and prevent a sale, or redeem the land from sale, in order to protect your interests in that title. Notwithstanding the long list of decisions, given by Black on Tax Titles, in section 420, it is to be observed that the author of that work says the doctrine is by no means univeral; and that in many of the states the purchaser of land sold, as delinquent for the non-payment of taxes, acquires the title and estate vested in the party assessed with the taxes, on account of whose delinquency the sale was made, at the commencement of the year for which the taxes were assessed, or at the time of the sale. Section 423.

The injustice, hardship and oppression, thus shown to re-

sult from following the doctrine of forfeiture in the name of the former owner to its logical sequences and the absolute lack of any consideration of public policy demanding such results, naturally suggest two inquiries: (1) Is the legislature clothed with power to frustrate them? (2) Has it exercised such power?

An affirmative response to the first inquiry, full, clear and emphatic, is found in certain provisions of the Constitution. Section 39 of Article VI of that instrument provides as follows: "The legislature shall not pass local or special laws in any of the following enumerated cases; that is to say, for　*　*　*　*　*　Releasing title to forfeited lands. . The legislature shall provide, by general laws, for the foregoing and all other cases for which provision can be so made." Section 4 of Article XIII impliedly gives, or assumes, the existence of very broad legislative power to deal with forfeited land titles. It says: "All lands in this State, waste and unappropriated, or heretofore or hereafter for any cause forfeited, or treated as forfeited, or escheated to the State of Virginia, or this State, or purchased by either and become irredeemable,' not redeemed, released, transferred or otherwise disposed of, the title whereto shall remain in this State till such sale as is hereinafter mentioned be made, shall by proceedings in the circuit court of the county in which the lands, or a part thereof, are situated, be sold to the highest bidder." These clauses have been held broad enough to authorize the transfer, by legislative action, of all the right, title and interest the state has in and to a tract of forfeited land, to a former owner thereof, on his redemption or purchase thereof in a proceeding instituted, under chapter 105, of the Code for the sale thereof, regardless of any irregularity in the proceedings or want of jurisdiction in the court to render such decree. Acts 1891, chapter 94. The validity and binding force of this statute, and, therefore, its constitutionality, were declared in *State v. Jackson*, 56 W. Va. 558, 570. It operated a transfer of title to the land, vested and remaining in the state at the date of the redemption, no matter how, nor from whom, acquired. *Id.* 571. For some reason, this provision was not incorporated in section 17 of chapter 105 of the Code, as amended and re-enacted in chapter 24, Acts 1893, allowing

redemption; but the same principle and legislative power were involved and operative in section 19 of said chapter, declaring that, if in any suit or proceeding theretofore had in any court, lands had been sold as forfeited for any reason, the purchaser, his heirs, devisees or assigns, who had complied with the terms of the sale, should be vested with all the title of the state to such land immediately before the date of such deed, and that all such sales thereafter made should have the like effect. This operated a release, transfer or grant of all the state's title, no matter whence or how it came. The grant was not limited to any particular title, the state's ownership of which by forfeiture may have been made the basis of the sale proceeding. It carried any and all others the state had acquired. *Coal Co.* v. *Howell*, 36 W. Va. 489, Syl. pt. 4. These and other statutes, upheld as valid by this Court, assert plenary·power in the legislature to make any disposition of forfeited land titles it sees fit to make. *McClure* v. *Maitland*, 24 W. Va. 561, expressly declares this to be the true interpretation of the Constitution.

The answer to the second is found in said section 29 of chapter 31 of the Code, providing as follows. "In all cases in which a question shall arise as to any such sale or deed, or the effect thereof, such deed shall be *prima facie* evidence against the owner or owners, legal or equitable, of the real estate, at the time it was sold, his or their heirs and assigns, and all other persons who might have redeemed the same within said one year, as hereinbefore provided, and also *prima facie* evidence against the State, counties, districts, school districts and municipal corporations, for or by which the taxes, or any part thereof, for which the land was sold, were levied and assessed, or which may claim the benefit of a lien for any unpaid taxes assessed against the land sold, and conclusive evidence against all other persons, that the person named in the deed as clerk of the county court was such, that the sheriff or other officer who made the sale was such sheriff or officer as stated in such deed, that the material facts therein recited are true, and that such estate as is mentioned in the twenty-fifth section of this chapter, vested in the grantee in the deed. Nothing in this chapter or any other law contained, shall be construed as precluding

the State, or any county court, board of education or municipality, from instituting and maintaining any suit or suits which might be instituted or maintained by any person claiming the land sold or any lien thereon, for the purpose of setting aside, for any reason, any tax sale or deed for land sold for taxes.    The auditor may, in his discretion, authorize the institution and prosecution of any suit, for and in the name of the State, for such purpose."

The clause, ''and also *prima facie* evidence against the State, counties, districts, school districts and municipal corporations, for or by which the taxes, or any part thereof, for which the land was sold, were levied and assessed, or which may claim the benefit of a lien for any unpaid taxes assessed against the land sold;" and the proviso commencing with the words, "Nothing in this chapter," were inserted by an act passed in 1887.    Prior to that time, the section read as it was, after having been amended and reenacted by section 29 of chapter 117 of the acts of 1872, and not different, in substance or effect, from what it was as originally put into operation by the legislation of 1863-66-69.    Stripped of the amendments made in 1887, there is no saving in this section in favor of anybody but the former owner or owners, legal or equitable, his or their heirs and assigns and persons who might have redeemed the same within one year after the sale.    The state is clearly not one of these.    As to all other persons the deed is made conclusive evidence that ''such right, title and interest * * as was vested in the person or persons charged with the taxes * * * for which" the land ''was sold * * * and all such right, title and interest therein of any other person or persons having title thereto, who have not in his or their own name been charged * * * with the taxes * * * for the year or years for the taxes of which the same was sold, and have actually paid the same," has been transferred to and vested in the grantee in such deed.    To this last class, the state belongs.    As to her and all strangers to the title, or persons having no interest in the land, the statute makes the deed conclusive, however irregular and defective it may be.    To her it says:   '' The purchaser has the title his deed

purports to convey and you cannot assail it.  As to you, he has it for all purposes, be the deed good or bad as regards the former owner.  The rights of the former owner against him, whatever they may be, can never accrue to you directly or indirectly.''  And it seems clear that no stranger to the title of the former owner can claim it, as against the deed, by transfer under section 3 of Article XIII of the Constitution, even though the deed be void, as to the former owner, and a forfeiture occur by reason of his failure to keep the land taxed and pay the taxes.  If he could the deed would not be conclusive as to him.  He could recover from the purchaser in ejectment, though the deed were put in evidence against him, and the statute would become nugatory and valueless.  A construction that would permit such a result would put the legislature in the extremely awkward position of having said the deed should be conclusive and yet having failed to make it so.  That the deed prevents acquisition of the former owner's title by transfer being thus apparent from the letter and logic of the statute, what good reason can be assigned for the contention that the state holds the land by forfeiture.  Having received all her taxes from the purchaser, does she hold the forfeited title of the former owner merely to swell her treasury, punish an innocent and dutiful citizen, and reward the delinquent owner for his dereliction of public duty?  These and no other results could be attained, and they are contradictory of the spirit and public policy, manifested by all the constitutional and statutory provisions, relating to land taxation and incidental settlement of land titles.  We avoid this inconsistency and deviation from principle by saying the statute makes the deed conclusive upon the state.  If the former owner permits a forfeiture of his title, after the execution of the tax deed, the state, by this statute, passes it to the grantee in the deed by a release or grant thereof.  Though the statute does not say this in terms, it necessarily implies such grant.  It is a statutory, not a common law, estoppel, operating as a covenant of general warranty in the deed of a private person, passing after acquired title.  Whether by release, grant or estoppel, it disposes of the forfeited title to a meritorious person, the instant the forfeiture accrues, just as in the case of a consti-

tutional transfer of a forfeited title. *State* v. *Harman*, 57 W. Va. 447, (Syl. pt. 15). It is a statutory release or grant of particular forfeited titles, becoming effective on the happening of the forfeiture. The forfeiture occurs, but this statute immediately passes the benefit of it to the tax deed purchaser. The former owner may prevent the forfeiture by keeping the land taxed and the taxes paid, and so remain in a position to assail and set aside the deed, if it be void, but, if he neglect this for five successive years, his tile is irretrievably lost by the forfeiture and the grant thereof to the purchaser effected by this statute. The tax deed may not be a grant from the state within the meaning of section 3 of Article XIII of the Constitution, *State* v. *Harman*, 57 W. Va. 447, *Rich* v. *Braxton*, 158 U. S. 405, for it does not in terms carry to the grantee all the right, title and interest of the state in and to the land, as does the deed of a commissioner of School Lands, nor any title of the state, since the sheriff's deed purports to convey only the titles of the delinquent owners. *McClure* v. *Maitland*, 24 W. Va. 561, Code chapter 31, section 25. But this is by no means inconsistent with the view that it rests the title it purports to convey, the former owner's title, not state title, indefeasibly in the purchaser, as to all persons other than the former owner, his heirs and assigns and persons who might have redeemed the land. If these persons afterwards permit a forfeiture of the title, they cease to be within the saving clause. The forfeiture puts the title in the state and she has estopped herself from claiming it for any purpose, as against the tax deed grantee.

The only plausible argument against this conclusion is that the state is not mentioned by name as one of the concluded persons. Statutes of limitation do not apply to the state, unless it is expressly so stated in them, but we do not regard this statute as being analogous to one of limitation. It is a part of the great system of law, executing a well defined public policy, relating to taxation and land titles, to be interpreted in the light of the considerations upon which that policy is founded and the purposes it is designed to effect. Statutes of limitation pertain to private remedies rather than public purposes. Taxation is a sovereign function, purely public in its nature and

purposes, and the settlement of land titles, so far as it has been made incidental to the exercise of the power of taxation, is of the same nature.

It was not the purpose of the legislature, in amending this section in 1887, to deprive it of the force and effect we here give it. These new provisions have no relation to this question. Their purpose is simply to prevent the deed from barring the state from enforcing any prior lien for taxes which she may have, or which may exist in favor of any county court, board of education or municipality, in any case in which a former owner or other lienor might cause it to be set aside. It was added simultaneously, by chapter 22, Acts 1887, with the amendment to section 1 of chapter 31 of the Code, conferring upon the state, counties, school districts and municipal corporations, the right to enforce liens for taxes by suit in equity. Said Act of 1887 affected these two sections of chapter 31 of the Code, in these two respects, and in no other way, and did not touch any other part of said chapter. This puts their object and purpose beyond question. They are mere companions and hand-maids of the amendment to section 1. Prior to 1887, there was no provision for the enforcement of liens for taxes by suits in equity. The amendment to section 1 of chapter 31 made in 1887, gave such remedy. Then it was deemed necessary to insert these provisions in section 29, to make them available in those cases in which sales for delinquency had been made. Without such an amendment to the latter section, the new remedy would not have been available in such cases. The changes made in section 29 argue that, but for such a saving clause, the section would make the deed, though defective, bar the state from suing in equity to enforce the lien for taxes. The amendment is really a legislative construction of this section in perfect accord and harmony with that which we here give it.

As has been stated, this view of the statute has not heretofore been presented to this Court. Two decisions have admitted the state as a plaintiff, under the conditions, shown by this record, *State* v. *Sponagle,* 45 W. Va. 415, and *State* v. *Harman,* 57 W. Va. 447, but, in the first, the tax deed was held good, and, in the second, it oper-

ated as color of title, sustaining a transfer under section three of Article XIII of the Constitution.   Hence the deviation from the present decision on the question wrought no injury.

Nor did the state obtain title by the sale made in the name of Giger, on the second day of September, 1869, for delinquency as to the taxes for the year 1867.   The report of the sale was not returned to the recorder's office within ten days from the date of the sale.   The sale occurred September 2, 1869, and the report was returned on September 13th.   This omission was fatal to the purchase by the state, whatever the effect of a valid sale to it, under the circumstances, would have been.   *Webb* v. *Ritter*, 60 W. Va. 193, 204, syl. pts. 1 and 2.

Having thus reached the conclusion that the forfeited Albright and Giger title, the instant the forfeiture occurred, passed out of the state to the persons claiming under the tax deed, it is apparent that she had no right to maintain this suit, and that the court below properly dissolved the injunction.   We, therefore, affirm the decree complained of.

*Affirmed.*